## THE STATE v. GEORGE W. GORDON, Appellant.

**Division Two, December 4, 1906.**

1. **MURDER: Motive: Ill-Will: Sufficiency of Evidence.** To establish ill-will as the motive for committing murder, the testimony must be such, when fully considered, as will authorize the jury in concluding that there was such a feeling of ill-will and revenge as prompted defendant to kill deceased. And evidence that defendant two nights before the death of deceased (his wife) told her that he was going to put her out of the house, that when they sat on the front porch he seemed friendly to her but she seemed disinclined to converse with him, and that on one occasion they had a dispute in the back yard about family affairs and she went into the house and slammed to the door, is not sufficient to establish a motive of ill-will. It falls far short of that deep-seated feeling of ill-will which the law denominates motive.

2. ———: **Sufficiency of Evidence: Conjecture.** A verdict of guilty cannot rest upon conjecture or suspicion.

3. ———: ———: ———: **Disregarding Testimony.** Defendant took a tricky and unsafe gun into the kitchen and set it against

199 Sup.—36

a meal-chest at which his wife was kneading bread, to be taken by a small boy to a gun-smith's to be repaired. He then went out of the kitchen through the dining-room and into his bed-room. The boy went into a bed-room whose door was immediately next to the meal-chest, and lay down cross-wise on a bed only four or five feet from where deceased was making bread. The gun went off, the shot entering her head, and she fell through the door, grazing the boy's feet as she fell. The boy testified that he jumped up, sprang out into the kitchen and ran towards the dining-room, and when he reached its door saw defendant coming out of his bed-room towards him, walking fast, putting on his coat. *Held*, that the jury were not bound to believe defendant, who testified to the same effect, but they could not disregard the testimony of the boy, the State's only witness on the subject, which tends to show that defendant was not present when the gun was fired, and base a verdict on a mere conjecture that, because the gun was fired and his wife killed, defendant was there and discharged it.

4. ———: ———: **Accounting for Death: Burden.** To support a verdict of guilty it is incumbent upon the State to establish beyond a reasonable doubt that defendant killed deceased. The burden is not on him to account for her death or the manner of her death, even though she be his wife, and comes to her death in his residence at a time when he is present therein. The burden is not on him to show it was an accident or done by some one else. And the fact that it is difficult to account for her death on the theory of an accident, is not sufficient to warrant the jury in concluding that it was not accidentally done or that defendant fired the fatal shot.

5. ———: **Conjecture: Unnatural Conduct.** It is altogether conjecture what would be the natural conduct of a defendant under unnatural circumstances, and little significance should be attached to his conduct because he did not act as some other person might have done. The fact that he came in the room where his wife's body lay, after the discharge of the gun which killed her, and went near her, but did not touch her or the gun, is of little value in establishing his guilt.

6. ———: **Evidence: Compatible with Innocence.** Where all the facts developed at the trial are as compatible and consistent with defendant's innocence as with his guilt, the court should sustain a demurrer to the evidence.

7. ———: ———: ———: **Instruction.** It is the province of the court, in the first instance, to determine whether the circumstances in evidence are consistent with each other, and inconsistent with any theory other than that of the guilt of defendant. If there is no substantial evidence going to establish that theory, the case should not be submitted to the jury.

8. ———: **Possibility of Defendant's Guilt.** The fact that defendant may be guilty is not sufficient to sustain a verdict. If the testimony fails satisfactorily to establish his guilt, it is better that he escape than that a precedent be made that must be general in its application to the guilty and innocent alike.

9. ———: **Accident.** Common knowledge and experience demonstrate that fatal accidents occur which are beyond man's reasoning power to reasonably and satisfactorily explain.

Appeal fom Cole Circuit Court.—*Hon. Wm. H. Martin,* Judge.

REVERSED.

*W. S. Pope, A. T. Dumm, W. M. Williams* and *Perry S. Rader* for appellant.

(1) The court erred in overruling defendant's demurrer to the evidence. There is no evidence in the case that defendant fired the shot that killed his wife. There is no testimony from which such an inference may be reasonably drawn. On the contrary, the State's evidence and the defendant's evidence agree in establishing the fact that defendant was in his bed-room at the time the gun was discharged; that the dining-room was between his bed-room and the kitchen where his wife was; and that the gun was in the kitchen when it was discharged. The testimony not only fails to show that defendant fired the shot that killed his wife, but it goes much further and affirmatively shows that he did not do so. Admitting, for the sake of getting an analytical view of the circumstances, that the boy correctly testified on direct-examination when he said he dozed after he lay down on the bed, and that he was mistaken when he said at the coroner's inquest and on cross-examination at the trial that it was immediately or within half a second after he lay down on the bed that he heard the shot fire, yet his consistent and uncontradicted evidence, and the uncontradicted evidence of the defendant, put the defendant in his own bed-room when the shot was fired.

State v. Scott, 177 Mo. 673; State v. King, 174 Mo. 662; State v. Crabtree, 170 Mo. 657; State v. Ballard, 104 Mo. 637; State v. DeWitt and Jones, 191 Mo. 58; State v. Mahan, 138 Mo. 112; State v. Brosius, 39 Mo. 534; State v. Hagan, 164 Mo. 654; State v. Morney, 196 Mo. 43. (2) Where it may be as reasonably conjectured from the evidence that deceased came to her death in some other way, a verdict finding defendant guilty of having killed her will not be permitted to stand. State v. Crabtree, 170 Mo. 642; State v. Nesenhener, 164 Mo. 461. The only theory upon which the verdict can be accounted for in this case is that the jury felt that defendant was required to show how his wife was killed, and as he did not do so they would, therefore, find that he killed her. The evidence does not show what caused the gun to go off, but it does give better reason to conjecture that it went off accidentally, or was unintentionally fired by the boy, than that it was fired by defendant. There is no proof of the *corpus delicti* in this case. State v. Crabtree, 170 Mo. 650. (3) The court erred in refusing to permit the defendant to show that Clarence Kouns was "careless in handling firearms," and "disposed to tinker with firearms" and "reckless with the use of firearms when he got hold of them." This evidence was objected to as being "a little bit remote." Ordinarily such evidence would have been inadmissible; but in this case it was not, but would have been of exceeding value to the defendant. (4) The court erred in not confining the case to murder in the first degree. The defendant is either guilty of deliberate murder or he is not guilty of murder in any degree. State v. Talbott, 77 Mo. 341; State v. Punshon, 124 Mo. 448; State v. Starr, 38 Mo. 272; State v. Phillips & Ross, 24 Mo. 490; State v. Patterson, 73 Mo. 713; State v. Wilson, 88 Mo. 16; State v. Collins, 86 Mo. 245; State v. Mahly, 68 Mo. 318; State v. Turlington, 102 Mo. 660; State v. Lane, 64 Mo. 324; State v. Stoeckli, 71 Mo. 559; State v. Allen, 116 Mo. 555.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1)   Witness Lartonoix was asked the following question by counsel for defendant: ''Well, do you know any thing about this little boy being careless about handling firearms and being disposed to tinker with firearms?'' An objection to this question was sustained by the court, and the defendant excepted.  The defendant then offered to prove the boy's habit of being reckless with the use of firearms when he got hold of them, and of his hearing the boy talk about his manner of using firearms; to which offer the court sustained an objection, and defendant excepted. The purpose of this evidence was to show that the boy, Clarence Kouns, and not the defendant, shot the deceased. It is well-settled law that threats made by third persons to commit a crime charged against the accused, or evidence creating an inference that some other than the accused is guilty of the homicide, is inadmissible. State v. Taylor, 136 Mo. 73; Buell v. State, 104 Wis. 149; State v. Crawford, 99 Mo. 80; State v. Barrington, 95 S. W. 235.  (2)   Prejudicial error was not committed in failing to instruct the jury on murder in the first degree, nor in instructing the jury on murder in the second degree.  State v. Todd, 194 Mo. 394; secs. 2535, 2369, R. S. 1899; State v. McMullin, 170 Mo. 608; State v. Frazier, 137 Mo. 317.  (3)  The court did not err in refusing to grant the defendant a new trial on the ground that the evidence was insufficient to support the verdict.  ''If there is substantial evidence tending to show defendant's guilt, the sufficiency of the evidence to support the verdict will not be considered by the appellate court.''  State v. DeWitt, 152 Mo. 76; State v. Williams, 149 Mo. 496; State v. Frank, 159 Mo. 535. (4) The court did not err in overruling defendant's demurrer to the evidence.  ''An instruction to the jury to acquit should only be given where there is no evidence

tending to prove the offense charged.'' State v. Warner, 74 Mo. 83; State v. Hill, 96 Mo. 357; State v. DeWitt, 152 Mo. 76; State v. Williams, 149 Mo. 496; State v. Frank, 159 Mo. 535. It is not contended that it is incumbent on the defendant to account for the killing of the deceased on some other theory than through his criminal act. That would be denying to him the presumption of innocence. But, it is contended that when facts and circumstances are proven tending to establish the charge in the indictment, it then becomes an issue, under the law governing circumstantial evidence, whether such circumstances are consistent with each other and with the defendant's guilt and inconsistent with any reasonable theory of the defendant's innocence. Whether they are or not is a question of fact for the jury. The evidence in this case shows beyond a doubt that the defendant and his wife were not living in harmony, and that there existed some serious trouble between them. The defendant and the deceased slept in separate rooms, and the latter always bolted the door of her bedroom on the inside before retiring. The foregoing facts show clearly that the relations existing between the defendant and his wife were strained and that their marital life was unhappy and discordant, and furnish a strong motive for the homicide. The defendant's testimony in giving his reasons for taking the loaded gun to the house the night before the killing of the deceased is unreasonable and improbable. If the gun was so defective that it frequently was discharged accidentally while being carried by hunters, the defendant doubtless knew of that fact. One of his own witnesses testified that he thinks he told him of it, and yet, according to defendant's evidence, he took this defective, unsafe gun to his home, set it against the wall near where his wife was at work in order that a nine-year-old boy should take it to the gunsmith's without having noticed whether or not the gun was loaded. The fact that when he brought the gun into his own room the night before he

took the precaution to place it under the bed, indicates very strongly that he did know it was loaded; otherwise, it was entirely unnecessary to put it in such a place. The defendant could pass by the gunsmith's in going to and returning from his store without going out of his way. The gunsmith's was much nearer the defendant's store than it was to his residence, and he could easily have taken the gun there to be repaired from his store at any time during the day. It is shown by the evidence that his nephew frequently carried dinner to the defendant at his store, and as the gun had been out of repair and dangerous for at least two years, he could have sent the gun to the shop from the store at any time by his nephew. It is, at least, deserving of note that although the gun had been out of repair for so long a time, it first occurred to the defendant that he should take it to his home late at night that it might be sent from there to the gun-smith's, and that this should have occurred the first night after he had told his wife that he was going to put her out of the house. According to the defendant's testimony, after he had placed the gun in the kitchen, he went back to his bedroom, put on his overcoat and was ready to start for the store when he heard the report of the gun. Being awake and on his feet, it would have taken him but an instant to have been at the side of his wife. The boy was lying on the bed and dozing when he heard the shot. He must have been somewhat dazed by what had happened, and yet he got up from the bed, noticed his aunt lying on the floor, passed from the bed-room into and through the kitchen, and, according to the defendant's testimony, met the defendant in the middle of the dining-room. Where was the defendant and what was he doing from the time the gun was discharged until the boy met him? The direction of the charge, as indicated by the wound, was horizontal and slightly inclined upward, and this fact, considered together with the point at which the charge entered and the direction in which

the body fell, indicates that the gun was in a horizontal position when the shot was fired, and makes it very probable that the shot came from the direction of the dining-room door of the kitchen. The fact that the gun struck the floor after the shot was fired, and that it was found from three to six feet nearer the dining-room door than where it had stood by the meal-chest, strongly sustains this theory.

FOX, J.—This cause is before us upon appeal, on the part of the defendant, from a judgment of the circuit court of Cole county, convicting the defendant of murder in the second degree. At the December term, 1905, of said court, the defendant was indicted and charged with the crime of murder in the first degree, for the killing of Alice H. Gordon, his wife, at the said county of Cole on the 8th day of January, 1904. At the March term, 1906, the defendant was duly arraigned and upon a plea of not guilty was put upon his trial.

At the time of the offense charged the defendant and deceased, his wife, were living on Madison street, south of McCarty street, in Jefferson City, Cole county, Missouri. The family consisted of the husband and wife and a nephew named Clarence Kouns, then nine years of age, who had made his home with the Gordons since his childhood. The defendant and the deceased had two children, a son and a daughter, who were then grown and living in Kansas City, Missouri. The son was 26 years of age, married, and a telegraph operator by trade. The daughter was two years older than the son, and had been engaged in the confectionery business in Kansas City. Mrs. Gray had rented four of the back rooms up-stairs of the defendant's house and was occupying them when Mrs. Gordon was killed. The daughter, Alma Gordon, on the morning that her mother was killed, unexpectedly had come from Kansas City, arriving at Jefferson on the early morning train and without awakening her parents, had entered the front door,

which was unlocked, and had retired in the front bed-
room up-stairs. About seven o'clock she was awakened
by the noise of a shot from a gun, which doubtless was
the shot that killed her mother. The defendant was a
merchant and conducted a small grocery store on High
street, about four blocks distant from his home. Being
without help in his business, he spent the most of his
time during the day at his store.

It is disclosed by the record that the defendant, the
deceased and their nephew were in the habit of sleep-
ing in separate rooms. The home of the defendant and
the deceased was a large two-story brick building,
standing east and west on the north side of an alley and
fronting west on Madison street. The house contained
twelve rooms, there being six rooms and a reception
hall on the first floor. The kitchen was in the back part
of the house, being in the southeast corner, and immedi-
ately north of the kitchen was the bed-room of the de-
ceased. The dining-room was west of the kitchen, and a
door opened from the kitchen into the dining-room
through the west wall and near the southwest corner of
the kitchen. Directly west of the deceased's bed-room
was the bed room of her nephew. West of the dining-
room and the nephew's bed-room was the bed-room of
the defendant, into which a door opened from
the dining-room. There was a front room or par-
lor on the west side of the defendant's bed-
room and a reception hall on the south. There
was an opening between the deceased's bed-room
and that of her nephew; the doors opening into each of
said last-named rooms were provided with bolts on the
inside, and there is testimony tending to show that the
deceased was in the habit of bolting these doors when
she retired. About four feet from the north side of the
east wall of the kitchen there was an outer door open-
ing on a porch on the east, and between this door and
the door leading from the kitchen into the deceased's
bed-chamber there was a space along the east wall of

the kitchen of between three and four feet. In this space there was a meal-chest standing against the said east wall. This chest was about 40 inches high, about 16 inches wide, and sloped from the wall, being about six inches lower in front than next to the wall. There was a door on the top of this meal-chest which opened back to the wall, and there was a biscuit board which fit inside, and on which deceased kneaded dough and made bread.

Some of the testimony on the part of the State tended to show that about seven o'clock on the morning that Mrs. Gordon was killed she was standing at the meal-chest kneading dough, when the defendant came into the kitchen with a Remington hammerless double-barrel shot gun and set it down behind the stove. This stove was standing along the west wall in the kitchen and about three feet north from the door leading from the kitchen into the dining-room. He asked his nephew, Clarence Kouns, to take the gun to Mr. Schmidt's and have it repaired. Defendant then took the gun from where he had placed it, carried it across the kitchen and set it down between the outer door on the east of the kitchen and the south end of the meal-chest, the breach being on the floor and the muzzle against the wall and the top of the meal-chest, the muzzle extending three or four inches above the chest. The defendant then went out into the dining-room and his nephew went into his aunt's bed-room and lay down cross-ways on her bed. The nephew had gotten into a doze when he heard the report of a shot-gun and then heard the gun fall to the floor. He jumped up, and saw his aunt lying on the floor, where she had fallen through the door into her own bed-room, her feet being partly in her bed-room. She was lying motionless, and there was some flour on one of her hands. The nephew ran out into the kitchen to the door opening into the dining-room. When at the dining-room door he saw the defendant at the corner of the table in the dining room at a point from which the defendant could not have seen where the deceased lay.

The boy said to the defendant, ''I never done it,'' and the defendant answered, ''God bless you, I know you never done it.'' Then both went into the kitchen to within four or five feet of the body of the deceased. The defendant did not touch the body of his wife, nor did he speak to her. The defendant and the boy then went from the kitchen through the dining-room and the parlor and out on the front porch. A man was standing outside of the house and the boy said, ''My aunt is dead,'' and the three went back into the kitchen. By that time the daughter, having heard the report of the gun, had hastened down-stairs. The defendant was greatly excited and was wringing his hands and stamping his feet, but at that time was shedding no tears.

On the meal chest was found a wooden tray containing some flour and dough; a pair of spectacles with straight temple pieces was found in the tray. The gun was on the floor of the kitchen about midway between the east door of the kitchen and the door leading from the kitchen to the dining-room; the breach of the gun was toward the dining-room door and about five feet therefrom; the muzzle was pointed toward the meal-chest and was about four feet from the chest.

The post-mortem disclosed a fatal gun-shot wound just beneath the mastoid process on the right side of the head, about an inch back of the right ear and a little below the level of the lower lobe of the ear; that the shot broke the bones of the skull and deflected downward and came to the maxillary bones in front of the left ear, breaking both jaw bones. There was a narrow margin about one-eighth of an inch wide blackened with powder and the shot.

To fully appreciate the testimony of Clarence Kouns it is perhaps well to state at least the substance or the principal features of his testimony concerning the occurences about and near the time that the gun was discharged that resulted in the death of Mrs. Gordon. He said that he first saw his uncle on the morning

that his aunt was killed in the dining-room door leading into the kitchen; that he had the gun and that he first set it down behind the stove in the kitchen, and after he first set it down he said to him that he wanted him to take the gun up to Mr. Schmidt's and have it repaired and have it charged to him, and he says, "I replied, All right." Then he states that his uncle took the gun up and took it over to the meal-chest and set it down, leaning it up against the meal-chest on the south side, and after having placed the gun against the meal-chest the defendant went out of the kitchen into the dining-room and he, Clarence, went into Mrs. Gordon's bedroom and lay down cross-wise on her bed; that he did not have on his shoes or coat; that he thought he dozed off or partly fell asleep; that he heard the gun fire and fall on the floor; that Mrs. Gordon fell through the open door and grazed his feet as she fell; that the feet or about four inches of the body extended into the kitchen, the rest of her body was in the bed-room; that immediately when he heard the gun fire and the gun fell he jumped up, sprang out of his bed-room, stepped over Mrs. Gordon's feet, ran out toward the dining-room and as he got into the dining-room door he saw the defendant coming towards him, putting his arm into a sleeve of his coat; that the defendant was then on the other or west side of the dining-room table; that as soon as he saw the defendant he said to him, "Uncle, I never done it;" that defendant said, "God bless you, I know you never done it." In one part of his testimony he says that after these words passed between him and his uncle they cried and went into the kitchen and looked at the body. In another part of his testimony he says that "we went into the kitchen; we were standing there crying and then my cousin came down and he told that man to go out a few minutes until she got her clothes on." He further states that neither of them touched the body or the gun; that they then went to the front porch, saw a man whom Clarence did not know, one of

them spoke to him, he came in and the three went to the kitchen and while there Miss Alma came down into the room in her night clothes, with a bed-quilt about her person. On direct examination of Clarence Kouns he testified that he thought he had been lying across the foot of the bed just a few minutes before he heard the report of the gun. On cross-examination he testified that he did not know how long he was there, that he could not gauge the time very nicely or accurately, but that he testified at the coroner's inquest that it was immediately or within a few seconds after he lay down on the bed that the shot was fired, and that he says the same thing now, and that everything was fresh in his mind at the time of the coroner's inquest; he further testified that it was just about ten seconds after the shot was fired until he got around to the dining-room door so that he could look into the dining-room and saw the defendant coming out of his room walking fast. On both direct and cross-examination he testified that he got up immediately when he heard the gun fire. In part of his testimony he said that he sprang out when he heard the gun fire; at another time he said that immediately after the gun fired deceased fell and he jumped out of bed at once and went to the door between the kitchen and dining-room and saw the defendant beyond the dining-room table coming toward the door, putting on his coat, with one sleeve of his coat on. This witness further testified that, after the defendant had set the gun down at the meal-chest, the defendant went back to the door between the kitchen and dining-room, and into the dining-room; and upon cross-examination he stated that defendant then had on all his clothes except his coat; that he went into the dining-room going west; that he heard the noise of his steps and he says, "I heard him walk to the end of his bed;" and then says, "I just laid down and heard him stepping, walking in there by his bed some place, in his bed-room." He further testified that he heard his foot steps after his

aunt was killed before he saw the defendant; that he first heard his foot steps after the shot was fired coming back from his room into the dining-room; "that was after I got out of the bed, just a second or two;" that as he jumped out of bed he heard his uncle start out of his room going into the dining room; that he appeared to be walking fast; when he got around to the dining-room door so he could look into the dining-room he saw the defendant coming towards him—coming towards the kitchen door. Clarence further said that he did not know how long it was after the shot was fired that he saw the defendant coming toward him, but estimated it at about ten seconds. He further states that when he said to the defendant, "I never done it," and defendant replied, "God bless you, I know you never done it," defendant could not at that time from the position he was in have seen in the kitchen the body of deceased. Clarence further states that he was somewhat excited when he said to his uncle, "I never done it." He further testified that two nights before the killing of Mrs. Gordon defendant said to his wife that he was going to put her out of the house, and that Mrs. Gordon did not make any reply to this statement; however, this statement was followed by the additional statement that there was no fussing between the defendant and his wife; that he treated her well and kindly and that he knew of no unfriendly feeling between them.

This sufficiently indicates the nature and character of the testimony given by this boy, who was only nine years old, upon the most important features pertaining to this unfortunate occurrence which resulted in the death of Mrs. Gordon. His testimony is fully disclosed in all of its details in the record, but we see no necessity for reproducing it. While an analysis of his detailed statement as contained in the record may apparently show some conflicting statements, yet in determining the main question involved in this proceeding we deem such variance in his testimony immaterial. He was

comparatively a young boy and it is not to be expected, under the circumstances surrounding him at the time, that all of his statements would entirely harmonize, however, we are impressed with the belief that he undertook to make an honest and truthful statement of what really occurred. We will give his testimony further attention during the course of the opinion.

Mrs. Ewing was introduced on the part of the State. She substantially said that she never saw the defendant and his wife out in public anywhere together more than on the front porch, and that, so far as she could see, the deceased did not seem particularly friendly toward the defendant. Her observation of them sitting on the front porch was that the defendant talked to her in a friendly spirit, but that the deceased did not seem inclined to converse with the defendant.

Mrs. Gray, who lived up-stairs in part of the Gordon residence, testified that on one occasion she heard some little dispute between them in the back yard about family affairs, and that the defendant started toward the door and that the deceased slammed the door; she did not hear anything that was said at the time between them. This was the only time that she ever heard anything like a dispute or controversy of an unfriendly character between them.

The testimony on the part of the defendant consisted of his own testimony, together with that of numerous other witnesses. He testified and explained fully the location of his store and that he kept guns in his store for the purpose of hiring them to hunters; that he had but little or no experience in the handling of guns. He had no clerk and usually went to the store about seven o'clock in the morning and remained until nine o'clock at night; sometimes he went to the store without his breakfast and his wife would on such occasions send his breakfast to him; he very seldom went home for dinner; that meal was usually sent to him. There were occasions when he remained late at the

store at night and would eat a lunch there; if he got home in time he would eat his supper at home. His place of business was on High street, east of Adams street. On the night of January 7, 1904, he took the gun that has been referred to by the witnesses home with him from the store with the view of having his nephew take it to the gun-smith with whom he had arranged to repair it. He testified that he did not know that the gun was loaded, and took it home for the purpose of sending it by his nephew to the gun-smith's shop for repairs. He placed the gun under his bed in the room where he slept. The gun-smith's name was Schmidt; his place of business was on Monroe street between High street and the first alley south of High street. Schmidt, at the time of the trial, was dead and therefore did not testify in the case, but the defendant testified that Schmidt was not in the habit of going to his place as early as he was, and that the gun-smith usually closed up his shop before defendant left his store. The defendant then proceeded to detail his habit in going to and from his store; he said that his usual route was down McCarty east until he came to Adams street and then he turned north to High street and then he went down High street until he reached his store, and that he returned by the same route. There was no testimony introduced on the part of the State contradicting the defendant as to his statement as to the route he usually took in going to and returning from his store. He further testified that the next morning after taking the gun home, as before stated, he got up and put on all his clothes except his coat and went into the kitchen where his wife was kneading dough at the meal-chest; that he asked her if Clarence could take the gun to the gun-smith's, that his wife partly turned and called Clarence, who slept in a little room which adjoined Mrs. Gordon's bed-room on the west, and from which a door opened into her bed-room, to "come here;" Clarence came out

and either she or defendant or both asked him if he could take the gun to Schmidt's shop and have it fixed; Clarence replied that he could.  Defendant went back to his bed-room, got the gun, brought it into the kitchen and told Clarence to take it to Schmidt's shop, that Schmidt would know what to do with it; he then took it over to the east end of the kitchen and leaned it up against the meal-chest and wall, the breach resting on the floor and the muzzle extending above the top of the meal-chest.  He further testified that when he set down the gun against the meal-chest and wall he went back to his bed-room for his overcoat and basket to go to the store; that he had put on his overcoat and was in the act of stooping down to take up the basket when he heard the gun fire; that he started towards the kitchen and met Clarence Kouns in the middle of the dining-room floor; that Clarence said to him, "Uncle, I didn't do it, I didn't do it;" that he said to Clarence, "God bless your soul, I know you didn't do it." That he and Clarence then went into the kitchen; that they looked at the body, but did not touch it or the gun. That Miss Alma came in and then Mr. Edwards to the door; the defendant further testifying denied that there was any discord or ill-feeling existing between himself and his wife; he also denied the statement of Clarence that he ever said to his wife that he was going to put her out of the house; but he and his daughter testified that the defendant and his wife had, on account of the delicate health of Mrs. Gordon, discussed the propriety of renting out their house and taking a smaller one.

There were other witnesses who testified that immediately after the killing defendant was in great mental distress; that he sat down in a chair with Clarence between his knees and several times stated that Clarence said he didn't do it, and that he said to him, "I know you didn't do it," and on cross-examination defendant testified that he "just kept saying that." The

199 Sup.—37

evidence tends to show that when people began to arrive at the house Miss Alma sat by the defendant with her hand resting on his shoulder, and that Clarence remained with him standing between his knees.

The son and daughter both testified in behalf of the defendant, and their testimony was to the effect that there was no fussing or quarreling between their father and mother and that their relations as husband and wife were kind and friendly. It was said by the daughter that while they sometimes had arguments and didn't all agree and have the same opinion, she had never heard them fuss in their lives, and she never knew of her father being guilty of any violent conduct toward her mother and knew of no violent quarrels between them. The daughter further testified that her father had made a deed to her mother, brother and herself to certain property, and that her mother had a half interest in three houses and lots in Tebbetts, Callaway county, and collected the rents from such property, and that she had accumulated this property by reason of an understanding between her mother and her father in which her father allowed her mother to borrow money from the building and loan, and also mortgaged the home place to buy the lots in Callaway county and these lots were bought and built upon. She further stated that her observation was that her father and mother were acting in harmony in trying to accumulate property. She also stated that while she thought at times that her father was close and penurious, yet he always provided well for the family, and gave her as well as her mother money when they needed it. She further stated that she observed great expressions of grief by her father upon the death of her mother. She said that in speaking of her mother's death and different things he cried frequently, but that right at the time of her death she didn't think that her father shed any tears, and she said, "I didn't shed any either, for the reason that the shock was too great for tears."

Mrs. Julia Miller testified on the part of the defendant. She was a sister of Mrs. Gordon, the wife of the defendant. She substantially testified that she was at the house of the defendant frequently and stayed there months at a time, and she testified most emphatically that she heard no quarreling between them, nor any fussing, nor harsh words; there was no unkind feeling between them, nothing of that kind, and she says, "I am certainly sure about that." She further said that her sister had explained why they didn't occupy the same room, that it was because her sister was in delicate health and that her sister gave that as her reason, stating that she was very nervous and in delicate health.

There was other testimony on the part of defendant tending to show that this gun was very easily discharged, in fact, would discharge easily without any apparent reason for it. The Assistant State Librarian, Mr. Menteer, and his brother, as well as Mr. Fromme, testified as to their actual knowledge of this gun; all of them had had experience with it, and on different occasions they had had the gun, and that it was discharged, and neither of them could give any reason why it should have been so discharged. There was no brush or twigs that could have touched the trigger and none of these witnesses could explain or give any reason for the discharge of the gun. Mr. Jack Menteer made the further statement that a hammerless gun is always cocked when it is loaded. One of the witnesses testified that he was examining the gun at the coroner's inquest, which was held shortly after the killing, and that in explaining its construction to the jury he slightly touched the trigger and the gun went off.

In addition to this testimony there were numerous substantial citizens of Cole county who testified to the good reputation of the defendant as a peaceable, orderly and law-abiding citizen.

This is a sufficient indication of the nature and

character of the controlling facts developed upon the trial of this cause. We will give the testimony further consideration during the course of the opinion.

At the close of the evidence the defendant re-- quested the court to instruct the jury as follows: "The court instructs the jury that under all the evidence in the case they would not be authorized to convict the defendant and they will therefore return a verdict of not guilty." Which instruction the court refused to give; to which action of the court the defendant at the time excepted.

The court then gave instructions upon murder in the second degree, presumption of innocence, reasonable doubt and other general instructions which the court deemed applicable to the cause. The cause was submitted to the jury upon the evidence introduced and the instructions of the court and they returned a verdict finding the defendant guilty of murder in the second degree, and assessed his punishment at imprisonment in the penitentiary for a period of ten years. Timely motions for a new trial and in arrest of judgment were filed and by the court overruled. The court, in conformity with the verdict of the jury, caused to be entered of record its judgment of sentence; from this judgment the defendant in due time and proper form prosecuted his appeal to this court, and the record is now before us for consideration.

OPINION.

The record in this cause discloses numerous assignments of error as grounds for the reversal of the judgment. It is apparent upon the face of the record and made manifest from the briefs of counsel, both for respondent and appellant, that the most vital and overshadowing proposition confronting us for consideration is the assignment of error predicated upon the action of the court in refusing to give the instruction at the close of all the evidence in the cause, in the nature of a

demurrer to the evidence directing the jury to return a verdict of not guilty. The final solution of this complaint at the action of the court in refusing to sustain appellant's demurrer to the evidence, will determine the necessity of any discussion of the remaining assignments of error; hence, we will first direct our attention to the main proposition.

It is unnecessary to say that this is an important case; the fact that a human being has been killed and the cause of such death is charged to be the wilfull and premeditated act of the defendant, fully impresses it as not only an important case, but as well one demanding the most earnest and careful consideration by those upon whom the great responsibility rests to make the investigation of so serious a charge.

The two opposing contentions in this cause, based upon the facts developed at the trial, sharply present for our consideration and solution the main proposition; that is, on the one side it is contended that the circumstances in proof were sufficient, together with the legitimate inferences the jury were authorized to draw from such circumstances, to warrant the court in submitting the cause to the jury. On the other side it is most earnestly insisted that the facts as detailed in evidence were insufficient to take the case to the jury, and that the conviction of defendant was predicated upon mere conjecture or suspicion.

The proper solution of the conflicting contentions as above stated necessitates a brief review of the facts as disclosed by the record upon which the trial court submitted this cause to the jury. We have carefully considered the testimony as disclosed by the record, in fact, have read every line of the testimony elicited upon the trial, and the proper solution of the contentions urged by opposing counsel must be sought in a fair and impartial consideration of such testimony.

First. It is contended on the part of the respondent that the testimony introduced by the State estab-

lished, or at least indicated a motive on the part of the defendant in killing his wife.

Second. It is insisted that the proof establishing the motive of the defendant for the commission of the crime, together with other facts and circumstances detailed in evidence, fully warranted the court in submitting the case to the jury.

Third. It is also earnestly contended by respondent that the facts and circumstances in proof clearly point to the guilt of the defendant of the charge preferred against him, and that whether such circumstances were consistent with each other and inconsistent with any reasonable theory of the defendant's innocence, is a question of fact for the jury, and therefore the case was properly sent to the jury.

This leads us to the first inquiry, as to what motive does the record disclose that prompted the defendant to kill his wife? The only motive suggested by the learned Attorney-General is that of ill-will, and if that was in fact the motive the testimony, in order to establish it, should show that state of feeling of ill-will and revenge on the part of the defendant which when fully considered would authorize the triers of fact in seeking a motive for the commission of the offense to reasonably conclude that such feeling of ill-will and revenge on the part of the defendant was the motive which prompted him to kill his wife. If the defendant killed his wife and the proof shows that fact, it is not essential, in order to warrant his conviction, to establish a motive, but if in this case it is contended that a motive on the part of the defendant to kill his wife was established by the evidence, then we say we are unable to give our assent to such contention. We have carefully analyzed the testimony on the part of the State, and have reached the conclusion that such testimony falls far short of establishing that deep-seated feeling of ill-will and revenge which, in contemplation of law, would

be denominated motive which would prompt one person to take the life of another. The only testimony on the part of the State which points in any maner toward the establishment of the proof of that state of feeling of ill-will and revenge which would prompt defendant to kill his wife, is that of the little nine-year-old boy who had been reared in the family of the defendant, Mrs. Gray, who lived in part of the house, and Mrs. Ewing, who was a near neighbor. The boy testifies that, two nights before the killing of Mrs. Gordon, he heard the defendant say to her that he would put her out of the house. This was all that was said. This same boy says they were not quarreling, that he just came in, told her he was going to put her out of the house, and that was all; no explanation of the tone of voice, as to whether he was in an ill-humor or temper, but says the reverse, that there was no quarreling. He further stated that the defendant and his wife had raised him and they were not in the habit of quarreling or fussing with each other, and that the defendant was not unkind to his aunt; that the defendant provided well for his family; they all had plenty to eat; the house was well furnished and everything comfortable about it. In our opinion more significance is attached to this single expression than it is entitled to as testimony in this cause. Disconnected with any sort of quarrel or abuse of his wife or a tone of voice which indicated bad temper or ill-humor, the mere expression, ''I will put you out of the house,'' is without any material significance and is insufficient to be made the basis of a reasonable conclusion that here was a motive such as would ordinarily be considered a motive which in any way would prompt the defendant to take the life of his wife.

Mrs. Gray simply testified to an observation of what seemed to her a little dispute between the defendant and his wife on one occasion in the back yard, and that the defendant started back toward the door and that Mrs. Gordon slammed the door to. She heard none

of the conversation between them, but simply relates the occurrence of this incident.

Mrs. Ewing testifies that they were not in the habit of going out in public together, but that she had observed them sitting on the front porch and there appeared to be an inclination on the part of the defendant to talk kindly and friendly to his wife and a disinclination on her part to enter into a conversation with him. This is substantially what these two ladies testified to at the trial; and manifestly it would be going a long ways in seeking a motive upon which to base the commission of a wrongful act to predicate it upon testimony of such little significance.

It is but common knowledge that disputes of this character often arise between husbands and wives, and while it may be said that it would be better and much more commendable if their lives could be spent entirely harmoniously, and without any friction, yet doubtless disputes and difficulties of the character mentioned by the witnesses occur in every community, even in those families who are regarded as happy and well regulated, and such occurrences usually do not provoke a serious thought by those who may be cognizant of such occurrences. The discord or disputes between the defendant and his wife, as referred to by Mrs. Gray and Mrs. Ewing, cannot be reasonably given that significance and importance as would furnish the basis for a reasonable conclusion that the defendant entertained such a deep-seated hatred and ill-will for his wife sufficient to prompt him to destroy her life.

In searching the history of crime in this and other States of the Union, where the courts and juries have dealt with the question of motive sufficient to induce the taking of human life, we have been unable to find any case where such motive was sought to be predicated upon so slight a showing. Motives which induce the commission of the crime of murder are divided into different classes; sometimes it is for gain and profit; at

other times to close the lips of those whom they fear will disclose things which may be prejudicial to them; at other times to gratify a feeling of hatred, ill-will and revenge; and when it is sought by testimony to establish such motives as a circumstance pointing to the guilt of a person charged with the commission of murder, the testimony should be reasonably substantial before the triers of the fact would be justified or warranted in fairly concluding that it was such a motive that induced the commission of the wrongful act.

Viewing the testimony of the State alone it fails to furnish reasonably satisfactory evidence of that deep-seated feeling of hatred, ill-will and revenge against his wife upon which to base a fair conclusion of motive upon his part to take the life of his wife; and when all the testimony is considered, including that of the little boy, the sister of Mrs. Gordon, the son and daughter of the defendant and the deceased, all of whom testified to the kind and friendly relations between the defendant and his wife, and the absence of any substantial testimony showing abuse by the defendant of his wife, or any quarreling between them, and the further showing made as to his providing for his family, even to the extent of mortgaging the home place for the purpose of securing funds for the wife to obtain property in her own name, for which she subsequently collected the rents, the question of motive is absolutely negatived.

## II.

It is insisted by respondent that the circumstances detailed in evidence at the trial, surrounding the killing of Mrs. Gordon, together with the testimony heretofore referred to and discussed, indicating motive, were sufficient to warrant the submission of the cause to the jury.

We have heretofore fully indicated our views upon the question of motive and the testimony sought to establish it. It is therefore unnecessary to further dis-

cuss that part of the case.   Numerous circumstances
are pointed out by respondent as warranting the sub-
mission of this cause to the jury.   As before stated, we
have analyzed in detail all of the testimony surround-
ing this unfortunate occurrence.   The difficulty with
which the State was confronted in making out a case
sufficient to go to the jury was that the same evidence
upon which it had to rely in order to secure a convic-
tion, which in any way pointed towards the commission
of the crime charged by the defendant, equally, if not
more clearly, tended to show that he was not guilty of
the offense charged.   In other words, there was not a
circumstance detailed before the jury upon the trial of
this cause but what was clearly reconcilable with the
theory of absolute innocence of the defendant, and mak-
ing every fair and legitimate inference from the cir-
cumstances relied upon by the State, still, when all of
the testimony is carefully analyzed, it is made manifest
that the finding of the jury as to some of the facts nec-
cessary to support their finding was predicated upon
mere conjecture or suspicion.

Common observation demonstrates that men fre-
quently do things unusual and without any apparent
reason for so doing, and it often occurs that their acts,
apparently innocent at the time, are construed at least
as suspicious circumstances when they are subse-
quently charged with the commission of some offense.
In this case the gun of the defendant was out of repair;
the testimony shows that the night before this accident
he closed his store rather late, and took the gun home
with him; his wife and nephew had retired; he went
into his room, put the gun under his bed and retired;
the next morning, according to the testimony of Clar-
ence Kouns, the nephew of the deceased, upon whose
testimony the State must rely for support of the judg-
ment in this case, he went into the kitchen with his gun.
He said to Clarence, in the presence of his wife, that
he wanted him to take the gun to Mr. Schmidt's and

have it repaired, and have it charged to him.  According to Clarence's testimony, he first set the gun down behind the stove and after asking his nephew to take it to the shop to be repaired and have it charged to him, he then took the gun and placed it over by the meal-chest, as heretofore indicated in the statement of this cause; Clarence replied, "All right," that he would take the gun.  Clarence testified that, after his uncle had set the gun down at the meal-chest he, his uncle, went back to the door between the kitchen and the dining-room and into the dining-room, and that he had on all his clothes except his coat.  He further states that his uncle went into the dining-room traveling west; Clarence then went into Mrs. Gordon's bed-room and lay down crosswise on her bed.  As to how long he was on the bed his testimony is not entirely satisfactory; however, it is apparent that he was only there a short time before the explosion of the gun aroused him.  He further testifies that about the time he lay down he heard his uncle; heard him walk to the end of his bed; he says, "I just laid down and heard him stepping, walking in there by his bed some place, in his bed-room."  The gun was discharged and the noise of the gun aroused Clarence.  He further testified that after the shot was fired he heard the foot steps of his uncle coming back from his room into the dining-room; he says that as he jumped out of the bed he heard his uncle start out of his room coming into the dining-room and that he appeared to be walking fast, and that when he, Clarence, got around to the kitchen door so he could look into the dining-room he saw the defendant coming toward him, that is, coming toward the kitchen door.  That was only a few seconds after the shot was fired.  The defendant testified that he did not know the gun was loaded and that he took it down to his house for the purpose of having the boy take it to the gun-smith's to be repaired.  Now, while the jury were not bound to believe the defendant, yet the fact that the next morning as soon as he saw his

nephew he requested him to take the gun to the gunsmith's shop for repairs, at least tends to corroborate the defendant. Again, we have in this case the testimony of the defendant that at the time this gun was discharged he was in his own bed-room, and the testimony of his nephew, Clarence Kouns, tends strongly to corroborate the testimony of the defendant as to that fact. While in the testimony of Clarence there are some conflicting and inconsistent statements, yet when you consider his testimony as a whole there can be no question but what it tends strongly to corroborate the defendant's statement that he was in his bed-room when the gun was discharged. Clarence says that when he jumped out of the bed he heard his uncle start out of his room into the dining-room; that he appeared to be walking fast, and that when he got around to the kitchen door he saw the defendant coming from the direction of his room.

Now, while the jury had the right to disregard the testimony of the defendant, and had the right to believe or disbelieve the testimony of Clarence Kouns accordingly as they may have believed it to be true or untrue, still, they were not warranted in rejecting the only testimony, that of Clarence Kouns and the defendant, which tends to show where the defendant was at the time this gun was discharged, and without a syllable of testimony contradicting them, simply conjecture that, because the gun was discharged, the defendant was there present and discharged it and killed his wife.

It was incumbent upon the State to show that the defendant fired the shot that killed his wife, and while it is not necessary that this showing should be made by direct testimony, but may be shown by circumstantial evidence alone, still, it must be established by either direct or circumstantial evidence, and we have in this case the testimony of Clarence Kouns, the principal witness for the State, upon whose testimony the State must rely for support of this judgment, strongly tend-

ing to show that at the time the gun was discharged
the defendant was not present in the kitchen but was in
his own bed-room. This is only a fair and reasonable
conclusion to be drawn from the testimony of Clarence
Kouns. Analyze his examination in chief, or his cross-
examination, or his re-direct-examination or re-cross-
examination and but one conclusion can be reached, and
that is that when the shot was fired his testimony
strongly indicates that defendant was in his own bed-
room and that Clarence jumped up or sprang out of
the bed upon which he was lying and saw his uncle
coming toward the kitchen walking fast, and that was
only a few seconds after the shot was fired.

Our attention is directed to the fact that the de-
fendant upon bringing the gun home that night put it
under his bed. We do not regard that as of any impor-
tant significance; his wife and nephew had retired, and
what difference would it make whether he put the gun
under his bed or set it up in the corner of his room?
That in our opinion does not throw any light upon the
crime charged. He evidently was not undertaking to
conceal it; he knew his nephew was there; he walked
into the kitchen the next morning with the gun in his
hand, in the presence of his wife and nephew, and re-
quested Clarence to take the gun to the gun-smith's
shop for repairs, and to tell Mr. Schmidt to charge the
same to him,

Again, our attention is directed to the exclamation
of Clarence and the response of the defendant when
they met in the dining-room after the discharge of this
gun, as a circumstance prejudicial to the defendant.
Upon this subject Clarence testifies that when he jump-
ed up or sprang out of the bed-room he stepped over
Mrs. Gordon's feet, ran out toward the dining-room,
and as he got in the dining-room door he saw the de-
fendant coming through the dining-room door, putting
his arm into his coat. As soon as he saw the defendant
he said to him, "Uncle, I never done it;" that defend-

ant said, "God bless you, I know you never done it."
Taking a practical view of that circumstance, we think
it is of very little importance so far as tending to estab-
lish the guilt of this defendant.  Doubtless, under the
conditions then surrounding him, he had just stepped
over the feet of his aunt, who was lying there dead, he
was very much excited, and his nervous and excited
condition was manifestly apparent to his uncle, who was
then making his way to the kitchen.  His uncle knew
that the gun had been discharged and while he may not
have then been in a position to know that his wife had
been killed by such discharge, yet the remark, "God
bless you, I know you didn't do it," was just as natural
and applicable to the firing of the gun as it would have
been had he fully known at that time that his wife had
been killed.  We cannot agree with learned counsel rep-
resenting the State that it is a legitimate inference
from the use of the expression by defendant, "God
bless you, I know you didn't do it," under the circum-
stances, that the defendant knew that his wife was dead
and knew that he had killed her.  That partakes more
of conjecture as to reasons why the defendant used
such expression than it does of a legitimate inference
which naturally flows from the proof of a given state
of facts.

In order to support the judgment of the trial court
in this case it was incumbent upon the State to establish
beyond a reasonable doubt that the defendant shot and
killed his wife, Mrs. Gordon. The burden by no means is
placed upon the defendant to account for her death or
the manner of her death, and the State in making out
its case developed the theory, as advanced by the de-
fendant, that the gun was taken to the house with the
view and for the purpose of having the nephew, Clar-
ence Kouns, take it to the shop for repairs; and when
all the testimony in this case is fully reviewed and
fairly considered, there is nothing unreasonable in the
defense's theory that the gun was taken to the house

for that purpose. The taking of the gun to the house of itself is an innocent act, and it is manifest that had not Mrs. Gordon been killed it would not have been thought that the act was an unusual or unreasonable one; but Mrs. Gordon having been killed by the discharge of this gun, it is urged now as a strong circumstance tending to prove the guilt of the defendant. While it is not contended that the mere fact that the defendant brought the gun to the house, as disclosed by the evidence, would be sufficient to warrant a conviction, yet it is apparent when we view the entire testimony that the jury evidently concluded that the burden was upon the defendant to show the manner and cause of death, and being unable satisfactorily to do so, more significance was attached to the fact of taking the gun to the house than it was entitled to under the circumstances. If the defendant under the same circumstances and conditions had taken this gun to the house and the next morning had gone into the kitchen, made the same request of Clarence Kouns to take it to the shop, and set the gun down at the identical same spot, and it should have been discharged, without killing Mrs Gordon or in any way injuring her, it is clear that no one would have given a serious thought to what is now considered damaging circumstances against the defendant. It is therefore made apparent that the serious results of the discharge of the gun tended strongly to influence the minds of the jury, and doubtless (unconsciously though it may have been) induced them to give the circumstances presented in evidence undue weight and significance. In fact, in taking a practical view of cases of this character, we must not overlook the inclination of the human family, when a death has occurred, either by accident or otherwise, to give undue significance to the conduct and actions of individuals ordinarily innocent, when undertaking to account for such death.

The testimony as disclosed by the record that the

gun-smith's shop was not open in the early morning when the defendant would be going to his store, and that it was closed at night when coming home, as explanatory why the defendant did not pass by the shop and leave the gun himself, is not an unreasonable explanation of such conduct. If such shop was not closed at those times it would certainly have been a very easy matter for the State to have shown it by citizens who lived in the community and who were doubtless familiar with the habits of the keeper of such shop in respect to the closing and opening of the same; and upon that subject, like any other, while the jury may have disregarded the statements of any other person as to the opening and closing of the gun-smith's shop, still they would not be authorized, without any testimony whatever upon the subject, to conjecture that such shop was open at the times indicated by the defendant that he would be going to and from his store. If such store was open at the hours that defendant was in the habit of going to and returning from his place of business, if the State insists that the conduct of defendant was unreasonable in taking the gun home at night with a view of having the boy take it to the shop for repairs, it was incumbent upon the State to show that such store was was in fact opened at those times, and it should not be left as a matter of conjecture that such shop was opened and that the defendant's conduct and actions were unreasonable.

Again, our attention is directed to the circumstance that the defendant upon seeing his wife lying motionless and dead did not call to her, nor did he touch her or the gun. We dare say that if conditions similar to those confronting the defendant upon the morning his wife was killed should surround a hundred men, no two of them would act alike. There is no accounting for the conduct or actions of a man under the circumstances surrounding the defendant at the time he went into the kitchen and found his wife dead, and his con-

duct and actions at that time, under conditions confronting him, in our opinion, are of little significance. No man can tell what would be the actions of a person similarly situated; therefore, we are unwilling to attach to the conduct and actions of the defendant at that time the importance that learned counsel for respondent so earnestly insist upon.

We have indicated in a general way the controlling features of the testimony in this case on the part of the State, as well as the defendant, which sufficiently discloses the nature and character of the testimony upon which the court submitted this cause to the jury, and we repeat that after a careful analysis of the testimony developed by the State alone at the trial, it absolutely fails to make out such a prima-facie case against the defendant as authorized the court to submit it to the jury. Every fact as developed in the trial of this cause is as compatible and consistent with defendant's innocence as with his guilt. That Mrs. Gordon, the wife of defendant, lost her life by the discharge of a shot-gun, is conceded, but upon the trial of the defendant charged with the killing of his wife, the burden does not rest upon him to show how she met her death, and the fact that it is difficult to account for her death upon the theory of accident is not sufficient to warrant the jury in concluding that it was not accidentally done and that defendant fired the fatal shot.

When we reach the field of accident, common knowledge and experience, as well as the history with which we are all familiar, recording the occurrence of many remarkable accidents, fully demonstrates that accidents occur which are beyond the reasoning power of any individual to furnish or advance any reasonable theory upon which to predicate or base the occurrence. No one will seriously contend, upon the facts disclosed by the record in this case, that it was impossible for Mrs. Gordon to have met her death by accident, for

199 Sup.—38

history records many accidents much more difficult to account for than the occurrence of the death of Mrs. Gordon under the circumstances disclosed. If the evidence as disclosed by the record is to be our guide, and that is all that should guide us in determining the sufficiency of the testimony, then we say that it fails to show that either the defendant or the boy killed Mrs. Gordon, and we are of the opinion that, if conjecture is to be resorted to, this record discloses far better reasons for conjecturing that this gun was discharged accidentally and produced her death than it does that it was willfully discharged by either the defendant or the boy, and that her death was occasioned by either of them.

This brings us to the only remaining proposition insisted upon by respondent. It is very earnestly and ably argued by counsel for the State that the question as to whether the circumstances in proof are consistent with each other and inconsistent with any other reasonable theory than that of the guilt of the defendant, is a question of fact for the jury, and such question is invariably submitted to the jury by proper instructions. Upon this proposition we will say that it may be conceded that where circumstances are detailed in evidence which point to the guilt of the defendant, charged with a criminal offense, then it is a question of fact to be passed upon by the jury as to whether the circumstances offered in evidence are of such a nature and character as render them consistent or inconsistent with any other theory than that of the guilt of the defendant.

The fundamental error assumed by this argument is that it overlooks the question, which is one purely for the court, and that is at the close of the evidence it is the exclusive province of the court to determine whether or not there is any substantial evidence which would authorize the submission of such an issue of fact to the jury. In this case we repeat that we have care-

fully considered all the details of the testimony and have reached the conclusion that upon the facts as developed by the State in making out its case, there was no substantial reason or evidence upon which the court was warranted in submitting the issue of the consistency or inconsistency of the circumstances detailed in evidence. The State in presenting the circumstances of this case to the jury developed the entire case, which included the theory of the defense that the death of Mrs. Gordon was the result of accident, and the conviction was sought to be supported upon the theory that the circumstances detailed in evidence, together with the conduct and actions of the defendant, established the fact that the accidental theory is unreasonable. Upon this proposition it is sufficient to say, upon the testimony as disclosed by the record, that the theory that the death of Mrs. Gordon resulted from accident is not unreasonable; and conceding the truth of all the evidence introduced by the State, such evidence falls far short of establishing the guilt of the defendant, and is by no means inconsistent with the theory that the death of Mrs. Gordon was accidental, and that the defendant is innocent of the crime charged.

Thus far, in reviewing the testimony disclosed by the record in this cause, we have confined the discussion principally to the facts as developed by the State. When we consider all of the testimony, including that introduced by the defendant, it simply tends to support and emphasize the correctness of the conclusions as herein indicated. The testimony of the Menteer brothers, as well as that of Clarence Fromme, clearly demonstrates the difficulty of accounting in any reasonable way for the discharge of the gun. The testimony of the sister of the deceased, as well as the son and daughter of the defendant and his deceased wife, put at rest the extremely slight testimony as to any ill-feeling existing on the part of the defendant against his wife. The occupancy of separate rooms by the defendant and the

deceased, as well as the habit of the deceased in bolting the doors, is entirely satisfactorily explained by the testimony of the sister and daughter of Mrs. Gordon.

We see no necessity for pursuing the discussion of the facts at any greater length. The law as applicable to the state of facts disclosed by this record is well settled in this State. While this court has ever been prone to yield to the finding of a jury upon issues of fact fairly presented to them, and has uniformly indicated its disposition to yield to the judgment of the judge who presided at the trial, yet where the life or liberty of a citizen was involved, it has with equal uniformity announced that judgment of conviction for crime must have substantial testimony upon which to rest, and in the absence of such substantial evidence have never hesitated to reverse the judgment.

An examination of the opinions by this court from its earliest history to the present time presents but one unbroken line of expression upon this subject, that is, that a judgment of conviction upon insufficient evidence should be be reversed. [State v. Crabtree, 170 Mo. 642; State v. Nesenhener, 164 Mo. 461; State v. Scott, 177 Mo. l. c. 673; State v. Mahan, 138 Mo. 112; State v. Marshall, 47 Mo. 378.]

There is no rule of law that is more deeply or firmly imbedded in our criminal jurisprudence than the one which requires that the guilt of an individual charged with the commission of a crime should be established by clear and convincing proof. It has often been said by this court that defendants should not be convicted upon mere suspicions of guilt or even strong probabilities of guilt, but to warrant their conviction the testimony when all considered should be clear and convincing, entirely satisfying the minds and consciences of the jury.

The law announced by the courts is not merely for an hour, a day or a week, but are precedents that must be general in their application to the guilty and inno-

cent alike, and, as was said in the case of State v. King, 174 Mo. l. c. 662, "this defendant may be guilty; if so, the testimony fails to show it satisfactorily, and if he is, it is better that he escape than to make a precedent that must be general in its application to the guilty and innocent alike."

We have thus indicated our views upon this cause as disclosed by the record, and the result of the conclusions reached upon this proposition renders it unnecessary to discuss the remaining propositions presented for consideration. The testimony in this cause is insufficient to support the finding of the jury, and at the close of all the evidence the court should have directed the jury to return a verdict of not guilty.

The judgment of the trial court should be reversed and the defendant discharged, and it is so ordered.

All concur.