### THE STATE v. HILLORY JOY, Appellant.

#### Division Two, May 28, 1926.

**1. WITNESS: Cross-Examination of Defendant: Motive.** More latitude is permissible in the admission of testimony to prove motive and malice in a case dependent wholly upon circumstantial evidence to sustain a conviction than in a case supported by direct evidence; but that does not authorize the admission upon the cross-examination of defendant of wholly immaterial matter which does not tend to prove either and is otherwise irrelevant.

**2. MURDER: Failure of Proof.** Substantial evidence tending to show defendant's guilt must be produced or a verdict of guilty cannot stand. The testimony of the two interested witnesses tending to show malice or motive being fully discredited, and it being admitted that defendant's wife was murdered with a bayonet knife belonging to his uncle, and there being no evidence that the knife was ever in defendant's possession or that he knew where it was kept, and it being fully established that it was kept in the uncle's trunk before the murder and was found under some clothes in a different part of the trunk after the murder, and there being no evidence connecting defendant in any wise with the knife, or otherwise with the crime, a judgment convicting him of murder in the second degree is reversed and defendant discharged.

**3. ———: Malice: Threats.** Where the evidence is wholly circumstantial, proof of motive is of paramount importance; and by motive is meant that which impels the mind to action, culminating in the commissi    cf a crime. Proof that a homicide has been committed and that defendant had made previous threats against deceased is not sufficient to warrant a conviction of murder, unless there is other evidence connecting the defendant with the crime. And in this case the testimony that threats were made is not only wholly discredited by the witnesses' own acts and the testimony of disinterested witnesses, but there is no evidence connecting the defendant with the murder.

**4. ———: Corpus Delicti.** The dead body of deceased and that he came to his death by the criminal act of someone other than himself establish the **corpus delicti.** Two elements constitute the **corpus delicti** in a homicide case, namely: (a) The dead body of a human being, and (b) that death was not the result of accident or suicide, but was caused by the external violence of some criminal agent. The criminal agency of the accused is not an element of the **corpus delicti,** but to sustain a conviction it must be shown that he was the criminal agent.

Corpus Juris-Cyc. References: **Criminal Law,** 17 C. J., Section 3758, p. 370, n. 45. **Homicide.** 29 C. J., Section 81, p. 1106, n. 45; 30 C. J., Section 406, p. 180, n. 43; p. 181, n. 45; Section 529, p. 284, n. 36; p. 285, n. 37; Section 537, p. 292, n. 60; Section 539, p. 295, n. 11, 12, 15; Section 540, n. 296, n. 19; Section 544, p. 299, n. 57; Section 560, p. 314, n. 55; Section 650, p. 405, n. 2. **Motive,** 28 Cyc., p. 20, n. 6.

Appeal from Boone Circuit Court.—*Hon. David H. Harris,* Judge.

REVERSED.

*Harris & Price* and *Cave & Cuthbertson* for appellant.

(1) The court erred in refusing to sustain the demurrer offered by defendant at the close of all the evidence, because there was no substantial evidence to sustain a conviction of the defendant for murder, either in the first or second decree. State v. Goldstein, 225 S. W. 911; State v. Gordon, 199 Mo. 561; State v. Francis, 199 Mo. 671; State v. King, 174 Mo. 662; State v. Staats, 246 S. W. 953; State v. Singleton, 243 S. W. 147; State v. Tracy, 284 Mo. 619; State v. Wheaton, 221 S. W. 26; State v. Bass, 251 Mo. 107; State v. Ruckman, 253 Mo. 500; State v. Kelsay, 228 S. W. 754; State v. Nave, 222 S. W. 744; State v. Adkins, 222 S. W. 432; State v. Hollis, 225 S. W. 952; State v. Anderson, 225 S. W. 896; State v. Welton, 225 S. W. 965; State v. Jaeger, 66 Mo. 179; State v. Packwood, 26 Mo. 363. (2) A verdict of guilty cannot stand if it is based upon suspicion or arrived at by the process of elimination. State v. Ridge, 275 S. W. 59; State v. Ballard, 104 Mo. 637; State v. Woodson, 175 Mo. App. 393; State v. Scott, 177 Mo. 672. (3) The verdict of the jury is unsupported by the evidence and is manifestly the result of prejudice, passion and partiality. State v. O'Kelly and Fitch, 258 Mo. 351; State v. Webb, 254 Mo. 414; State v. Prindible, 165 Mo. 353; State v. Primm, 98 Mo. 368; State v. Castor, 93 Mo. 243; State v. Jaeger, 66 Mo. 173; State v. Burdorf, 53 Mo. 65; State v. Marshall, 47 Mo. 378; State v. Daubert, 42 Mo. 238; State v. Mansfield, 41 Mo. 70; State v. Brosius, 39 Mo. 534; State v. Packwood, 26 Mo. 340. (4) The court erred in giving the State's instruction on murder in the second degree, and in refusing to give the instruction offered on the part of the defendant which was in the nature of a demurrer, telling the jury that they could not convict the defendant of murder in the second degree. State v. Swearengin, 190 S. W. 271; State v. Harris, 177 S. W. 364; State v. Evans, 124 Mo. 397; State v. Tabor, 95 Mo. 585.

*North T. Gentry,* Attorney-General, and *Claud Curtis,* Special Assistant Attorney-General, for respondent.

(1) There was sufficient evidence upon which to base an instruction on second degree murder. Whether the homicide is or is not characterized by deliberation is a question for the jury submitted under proper instructions. State v. Snow, 293 Mo. 193; State v. Kyles, 247 Mo. 640; State v. Liolios, 285 Mo. 1; State v. Young, 119 Mo. 495. Furthermore if the evidence showed a case of first degree murder only, the giving of an instruction on murder in the second degree is not an error of which defendant can complain. State v. Bell, 136 Mo. 120; State v. Todd, 194 Mo. 377; 21 A. L. R. p. 626; 16 C. J. sec. 2452, p. 1024. (2) The court committed no error in overruling defendant's demurrer. There was sufficient evidence to

prove the *corpus delicti* and to take the case to the jury. State v. Barrington, 198 Mo. 110; State v. Hall, 231 S. W. 1001; State v. Concelia, 250 Mo. 411; State v. Poor, 228 S. W. 812; State v. Bowman, 294 Mo. 245; State v. Page, 212 Mo. 242; State v. Sassaman, 214 Mo. 738. A conviction may be supported by circumstantial evidence. State v. Hall, 231 S. W. 1001; State v. Barrington, 198 Mo. 110. There is no hard-and-fast rule as to the sufficiency of the evidence to make a case for the jury, and each case must stand upon its own facts. State v. Bowman, 294 Mo. 245.

WALKER, P. J.—The defendant was charged by information in the Circuit Court of Callaway County with murder in the first degree. He was tried in the Circuit Court of Boone County, convicted of murder in the second degree, and sentenced to thirty-five years' imprisonment in the penitentiary. From this judgment he appeals.

On March 6, 1924, Mrs. Susan Joy, wife of the defendant, was found at about 10:15 o'clock at night sitting on the floor beside her bed in an upstairs room of the residence of herself and her husband, the defendant, bleeding profusely from the mouth and nose. She died almost immediately after being discovered, without having spoken.

The day following an inquest was held by the coroner, who after hearing several witnesses took the defendant into custody, brought him to Fulton and delivered him to the prosecuting attorney. The latter filed a complaint before a justice of the peace, charging the defendant with having killed his wife. A preliminary hearing was had and the defendant was bound over to answer in the circuit court. On March 21, 1924, the prosecuting attorney filed an information in the circuit court charging the defendant with murder in the first degree. The cause was continued twice thereafter on the application of the State. On September 1, 1924, defendant applied for and was granted a change of venue to the Circuit Court of Boone County. In that court the case was continued from term to term until April, 1925, when it was tried, resulting in a verdict and sentence as stated.

The defendant and his wife were beyond middle age, he being fifty-five and his wife fifty-four years old. They had been married about twelve years, and no children had been born to them. At the time of the tragedy they lived on a farm about three miles west of Auxvasse. Ben Joy, an uncle of the defendant, and a Mrs. Nagel, a sister of Mrs. Joy, lived with them. Ben Joy was an old bachelor and had been living with them about five years. He is referred to in the record as "Uncle Ben." Mrs. Nagel, who was a widow, had been visiting them for about three months. These parties were all

at the house the night of the tragedy. For some time prior thereto the defendant had suffered with neuritis in one of his feet. On the afternoon before the murder the defendant, his wife and Ben Joy went to Auxvasse. They returned about four o'clock and an hour or more later the three and Mrs. Nagel ate their evening meal. While at the table something was said in regard to the sale of a small interest in some land Mrs. Joy owned in Kansas, and the defendant declared that he would not join in the deed at the price she was offered. No controversy followed this declaration. When the meal was finished, the dishes washed, the cow milked by Mrs. Joy, and the chores necessary to be performed at a country home had been attended to by Ben Joy, these four persons sat around the stove in what was the living and dining room and engaged in general conversation until almost nine o'clock, when Ben Joy went upstairs to bed and later Mrs. Nagel also retired, leaving the defendant and his wife sitting by the stove. The house was a story-and-a-half frame building, consisting of three rooms on the first floor and three on the second. To reach the latter it was necessary to ascend seven steps to a platform about three feet wide and four feet long, across which, in front of the entrance to the platform, a curtain was suspended to serve the purpose of a door in obstructing the view from the space beyond. Two short flights of stairs of three or four steps each led from this platform to the rooms above; the flight on the right led to the room of Ben Joy, and the one on the left to the room of the defendant and his wife and to the adjoining room occupied by Mrs. Nagel. The latter testified that when she went up to her room the defendant and his wife were sitting near each other by the stove, conversing and apparently in a good humor, which had characterized their conduct towards each other during the evening. When Mrs. Nagel went to her room she placed a lighted lamp on a stand in such a position that it would shine through an open doorway between her room and that of her sister and the defendant, and left it burning to light them to bed. After retiring she heard no sound of any kind until a short time after ten o'clock, when she heard her sister call her name. She arose, went into her sister's room and found the latter sitting on the floor beside her bed with her head and shoulders resting on the bed and blood gushing from her mouth and nose. Mrs. Nagel hysterically began to call for Ben Joy and the defendant. The former being nearest came first, followed by the defendant, who almost immediately came from the dining room downstairs, carrying the lighted lamp which had been sitting on the dining room table where his wife had left him when she started upstairs. When defendant saw his wife's condition he fell on his knees, took her in his arms and begged her to tell him what was the matter. She was

then in her death throes and died while they were gathered around her without being able to make a response.

Ben Joy testified that he was awakened by the voices of the defendant and his wife conversing with each other; that the former, among other things, remarked that "Uncle Ben talked too much," whereupon he, the witness, in a loud tone, called his nephew a liar and the latter applied a like epithet to him; that the defendant and his wife, when the witness heard them talking, were down in the dining room where he had left them when he retired; that soon thereafter he heard someone coming up the first flight of steps to the platform and when he asked who it was Mrs. Joy answered, "Oh! It's me, Uncle Ben," and that he heard her turn and go up the short flight of steps into her room; that quickly thereafter he heard Mrs. Nagel calling for him and the defendant to come and he went; that he heard no one coming up the stairs before Mrs. Joy answered him.

The defendant testified that after Ben Joy and Mrs. Nagel had gone to their rooms his wife dressed his afflicted foot and they sat and talked pleasantly for awhile about various matters, among other things he remarked that "Uncle Ben" talked too much to other people about their business affairs that should not be discussed outside of the family; that the latter, who had evidently heard their conversation, called out from upstairs, cursed the defendant and called him a liar; that he, the defendant, replied in a like tone and to the same effect and that they bandied words in angry tones for a few minutes, Ben Joy being at the head of the stairs and the defendant in the dining room with his wife; that she placed her hand upon his shoulder and pleaded with him to desist from further words and that she would go up and quiet Uncle Ben; that he said nothing more to his uncle, and that she started to go upstairs, and he went into the kitchen and as he passed the dining room door leading to the stairway he saw that she had just reached the top step of the first flight of stairs where the curtains were suspended, when he heard her exclaim; "Oh! Uncle Ben, it's me;" to which Ben Joy replied, "What in the name of God are you doing here?"; that she then passed behind the curtain. He thought nothing of her exclamation, but just as he reached the kitchen he heard Mrs. Nagel call him and he took the lamp from the dining room table and ran upstairs. That he realized when he saw his wife with blood streaming from her mouth and nostrils that something terrible had happened to her and he knelt down by her side and begged her to tell him what was the matter; that she was unable to answer him and died in his arms. He notified the neighbors and asked that a doctor be sent for to find out the cause of his wife's death and also an undertaker to prepare the body for burial. A doctor came, examined her and decided that she had died from a hemorrhage as a result of arterio-sclerosis, or a hardening of the ar-

teries.  Before the doctor left an undertaker came and upon examining the body found a narrow wound, as if from a cut or stab, on the upper part of the right side of her chest, between the collar bone and the first rib.  It had bled but little and from a casual observation appeared to be only a superficial cut.  The undertaker called the doctor and the latter, upon examining the wound, found that it had been inflicted by a long sharp weapon, which had penetrated the pectoral cavity, passed through the lung and thence inward and downward to the spinal column.  The profuse hemorrhage was then found by the doctor not to be the result of the rupture of a hardened artery, but from the severing of an artery which filled the torn lung tissue with blood and sought egress, due to the pressure of the collapsing lung, through the mouth and nostrils.

The physical facts concerning the immediate scene of this murder show that a person ascending the steps from the first floor would reach the top step with their right side nearest to the short flight of steps leading to Ben Joy's room, and would be standing, when on the top step of the first flight, very near the right side of the curtains hanging across the entrance.  Mrs. Joy was stabbed on the upper part of the right side of her chest, and the torn or pierced portion of the curtain, through which the defendant contended the weapon had passed, was on that side of the entrance.  The difference in attitude between one standing on the platform behind the curtain and another on the top step would be the height in inches of the riser of that step, or the difference in altitude between the floor of the platform and the top of the last step.

The only evidence of any destructive weapon on these premises was what is termed in the testimony a "German bayonet," owned by Ben Joy and kept by him in a trunk in his room.  It was a most formidable weapon, with a guard like a sword protecting the handle from the blade, which was twelve inches in length and tapered from a width of three-fourths of an inch at the handle to a stilleto-like point.  The doctor who examined Mrs. Joy's wound said that her death had been caused by a weapon of like character to that of the bayonet.

It seems to be conceded that Mrs. Joy was wounded just as she reached the curtains and before she had parted them to step upon the platform.  A careful examination of the floor, steps and walls down and upstairs, disclosed no blood stains.  This was explained by the testimony of doctors who stated that due to the nature and location of her wound she would have been enabled to walk a few steps before there was any appreciable hemorrhage; that the opening of the wound being narrow, the blood from the pierced artery, instead of flowing out through it, found egress through the lung, and having filled it was ejected through the mouth and nose.

When Ben Joy declined to notify the neighbors the night of the tragedy, the defendant went to perform that said duty. While he was gone Ben Joy pointed out to Mrs. Nagel the wound on Mrs. Joy's shoulder or chest, but upon the defendant's return they said nothing to him concerning it. This was before the wound was discovered, either by the doctor or the undertaker, and it was known only to Ben Joy and Mrs. Nagel.

Counsel for the State admitted in their argument to the jury that the bayonet was the weapon which had caused Mrs. Joy's death. At the coroner's inquest, held the day after the murder, the production of the bayonet was demanded by the coroner, and in company with the sheriff Ben Joy went to his room and took it from under some clothes in his trunk and handed it to the sheriff. From that time until the case was determined in the circuit court and submitted in this court it has been in the possession of the State. No examination was made to determine whether it had any blood stains on it.

It was the habit of Mrs. Joy to partially undress and prepare for bed downstairs, there being no fire upstairs. On the night she was murdered she undressed as usual before starting upstairs, and when she left her husband she had on her night robe and slippers. Her everyday clothing was found, after her murder, downstairs in the dining room on a chair by the stove, where she had left them. There was physical evidence, in addition to the oral testimony, that the defendant and his wife had not retired, but that when stabbed she was going upstairs for that purpose, in this: that the bed in which they slept was still made up when she was found dying beside it, and on it at the foot were clothes of that week's washing, which she had that day, after ironing, placed there ready for further disposition.

The foregoing, intended as a connected narrative of the material testimony in this case, should be supplemented by a more detailed statement of the facts upon which, measured by the record, the State relied to secure the defendant's conviction.

Mrs. Nagel testified at the trial, in addition to what has been stated, that when the question arose as to the sale of Mrs. Joy's interest in some Kansas land, the defendant said with an oath, he would not sign the deed. At another time, when she does not state, the defendant and his wife had a discussion concerning his going to a hospital to have his foot treated and she questioned their ability to pay the expenses therefor, when he remarked to her with an oath: "You will wake up in hell some of these mornings over this little deed." At another time, when, where or in what connection she did not state, defendant threatened his wife and Uncle Ben and used vile and profane language in making the threat. She did not testify to the foregoing at the preliminary hearing.

Counsel for the defendant, while insisting upon his client's innocence and as explanatory of the tragedy, contended that, when Mrs. Joy started up the steps, first to quiet Uncle Ben and second to retire, the latter, infuriated at the defendant, took the bayonet out of his trunk, posted himself on the platform behind the curtain, which completely concealed him, and stabbed and killed Mrs. Joy, under the mistaken belief that he was assaulting the defendant.

In view of all of the other facts in this case and as relevant for whatever probative force it may have possessed, the court admitted testimony to the effect that when the defendant's case was first set for trial in May, 1924, Ben Joy, who was then staying with a relative in Richmond, Missouri, went into an outhouse and shot himself twice through the head, as he claims, accidentally. Counsel for the defendant insists that this characterization is a misnomer and an afterthought, uttered to conceal an effort at self-destruction.

Ben Joy was a man over six feet in height, and the height of Mrs. Joy was about five and a half feet.

I. We are concerned here more particularly with the probative force of the evidence upon which the verdict of the jury was based. The record is not burdened with prejudicial errors in procedure. For this the trial judge is to be commended. While the transcript discloses the admission of much trivial and wholly immaterial matter in the cross-examination of the defendant, the court doubtless admitted it upon the theory that it might tend to prove motive and malice. In the proof of the presence of these essentials to the commission of a crime, which, as at bar, is dependent almost wholly upon circumstantial evidence to sustain a conviction, more latitude is permissible in the admission of testimony than in a case supported by direct evidence. The latitude here granted was abused in that much of the matter brought out on the cross-examination of the defendant not only did not tend to prove either motive or malice, but was otherwise irrelevant.

**Failure of Proof.**

Proof was made of antecedent quarrels and disagreements between the defendant and his wife as tending to show malice. The probative force of the testimony tending to prove such antecedent relations between the defendant and the deceased must be measured by all of the other facts and circumstances in the case. They were affirmatively testified to by Ben Joy and Mrs. Nagel, and as affirmatively controverted by numerous neighbors who lived in the immediate vicinity of the defendant's home at the time of his wife's murder. That the latter were entirely disinterested, which is one of the strongest provocatives to truth, is not questioned. Of the former as much cannot be said. Ben Joy had been accused by the defendant of the murder. Just before it occurred he had become enraged at the de-

fendant, over a trivial matter it is true, but his manner manifests the trend of his mind and the violence of his temper. He at least cannot be said to have been a disinterested witness. Moreover, other facts discussed later, will demonstrate that he was in no frame of mind to fairly and fully tell the truth in regard to the marital relations between the deceased and the defendant.

The contrast between the testimony of Mrs. Nagel at the preliminary examination and at the trial was of so marked a character as to excite the interest and prompt the inquiry of any unbiased mind. At the former, which was but a week after the murder, when her grief for her sister must have been most poignant, and her resentment against the defendant, if she believed him to be guilty, most intense, she testified to no serious disagreements between the defendant and his wife nor to any violent threats or outbursts of temper on his part. In her testimony, at the trial, more than a year after her sister's murder, whether time which heals all heart wounds had assuaged her grief or not, she went upon the stand and magnified the former differences between the defendant and his wife to such an extent as to make him, not only the possessor of an ungovernable temper and an unbridled tongue, but a creature of malignity and cruelty. The transcript of the testimony at the trial discloses no fact which it was claimed connected the defendant with the crime, that was not known at the time of the preliminary examination. Despite this fact, lapse of time, change of scene and the engrossing occurrences of everyday life, instead of obliterating details and lessening the force of material facts, as most often occurs to others, but served in Mrs. Nagel's case to quicken her memory, or more accurately stated, encourage the exercise of a fertile fancy. The change in her attitude, therefore, toward the defendant and her estimate of his character, are, in the absence of any cause therefor, out of the ordinary, if not remarkable. As we recall our Virgil, not as applicable to the sex, but to this witness, *varium et mutabile semper femina.* Her later testimony, if true, and she was a right-minded woman, discloses a condition which would have precluded her from continuing a visit, not for weeks, but for months, in a household rent and torn with the strife and dissension which she states was created by the conduct of the defendant. Moreover, the wife herself, if of a normal disposition and a kindly heart, both of which are manifested by her attempt to alleviate her husband's pain and her desire to smooth out the differences between Ben Joy and him, had she been subjected to the treatment by the latter detailed by Mrs. Nagel, would, long before the fatal night when she died at the hands of an assassin, have reached the parting of the ways with her husband and have sought the solace which comes from an absence of such surroundings. These two witnesses are the only ones

who testified to any criminating circumstances which, under any construction, may be said to connect the defendant with this crime. They consist wholly of threats made at different times long before the tragedy and culminating, not in any act of the defendant's indicating an effort or a purpose to consummate them, but by a pleasant ·trip with his wife, the day preceding the night of her murder, to Auxvasse, a near-by town, to purchase groceries and other family supplies. Upon their return and after they had eaten their evening meal, they sat in pleasant converse until Ben Joy had retired and Mrs. Nagel was about to do so, when Mrs. Joy dressed the defendant's afflicted foot, and the current of their conversation was overheard by Ben Joy, whose anger was aroused by a reference made to him by the defendant, as detailed in the statement of the facts. Not only did no difference arise between defendant and his wife when this occurred, but at her request defendant desisted from further words and, as indicative of their amicable relations, she laid her hand upon his shoulder and said, ''I will go and quiet Uncle Ben.'' No fact or circumstances impugns the verity of this incident. So far as the record discloses, these words, except to call for her sister when stricken unto death, were the last she uttered.

There is· no color given by the evidence, direct or circumstantial, to sustain even an inference that Mrs. Joy was wounded before she reached the top step of the first flight of stairs. On the contrary, it is conceded that she received her death blow at that point. It is further not questioned that when she had dressed her husband's foot he replaced his shoe, the other one not having been removed, but did not lace it and was thus appareled when he started into the kitchen as she left, and afterwards when he answered Mrs. Nagel's call. If he preceded his wife up the flight of stairs she must have followed almost immediately, and instead of Ben Joy hearing the tread of one person ascending the steps he would have heard first one and then the other and he would also have heard the defendant descending the stairs. Unfortunately for the harmonious continuity of his testimony he does not so state. He only heard the footsteps of one person ascending the stairs. Furthermore, if the defendant had preceded his wife in ascending the stairs she was aware of this fact and when stricken, if he was behind the curtain, she must have seen him or whoever was there as she stepped upon the platform and staggered up the last short flight of steps to her room. Why, under those circumstances would she have exclaimed, ''Oh! Uncle Ben, it's me,'' and if he had been in his bed, as he contends, what would have prompted him to give utterance to the exclamatory inquiry, ''What in the name of God are you doing here!'' Doing where? The inquiry loses its meaning and resolves itself into an absurdity, unless he was in Mrs. Joy's presence addressing her. Only

by the personal presence of the parties can these exclamations be given a satisfactory explanation. The oft repeated exclamation of astonishment and reproof of "Et tu Brute!" loses its force and significance if it had not been uttered by the stricken Caesar in the very presence of his former friend but then his deadly foe. The beautiful and terse exclamation, attributed to General Pershing, "Lafayette, we are here!" would have sounded silly and meaningless, except when uttered as a declaration of succor at the tomb of the great patriot and friend of freedom. "Here," as even the child who is learning to lisp our virile English knows, means "in this place, i. e. where the speaker is." A truth loses none of its force by repetition; we repeat, therefore, that Mrs. Joy, if the defendant had preceded her in going up the stairs, knew that fact, and whether he was in his wife's room or on the stairway she would not, considering the circumstances under which they had just parted, have addressed her exclamation to Ben Joy, who says he was in his own room in bed.

A lie may trip lightly from the tongue, but it will not stand the test of analysis, because it is out of harmony with the natural relation of the things to which it has reference.

If the defendant murdered his wife, as the State contended and the jury found, when and in what manner did he obtain the possession of the bayonet with which the crime was committed? It was owned by and in the continuous possession of Ben Joy. He kept it in his trunk. By his own testimony he saw it there a short time before the tragedy, and it was found there by the sheriff when, under the order of the coroner, he was required to produce and surrender it at the preliminary examination the day after the tragedy. While it was admitted at the preliminary examination and at the trial that the deadly assault was made with this weapon, there was no evidence adduced or testimony offered to prove that it was ever in the possession of the defendant. The only semblance of even a suspicious circumstance in regard to it was the testimony of Ben Joy when he delivered it to the sheriff that it was not in the same place in his trunk then as where he had placed it a short time before. No intimation was made, however, that the defendant was in anywise connected with its change of location or that he knew where it was kept. To render him guilty, therefore, of the commission of this murder some showing should have been made to connect him in a criminatory manner with the weapon he used in its perpetration. He had, under the undisputed facts, but little opportunity to conceal it immediately after the murder, and practically none during the time intervening between its commission and the preliminary examination, to replace it in the trunk. A review of all of the testimony will demonstrate the correctness of these conclusions.

Mo. Sup.—2

Upon hearing the argument in this case we were impressed with the meager character of the testimony for the State upon which the defendant was convicted. Not content with the fair and somewhat complete statement of the facts made by both the State and the defendant we have gone over this transcript line by line and page by page, from the filing of the information to the signing of the bill of exceptions by the trial judge. This review has not only served to strengthen our former impression, but has transformed it into an abiding conclusion that there is no substantial evidence to sustain this conviction. Viewed from every vantage that the facts present, in a crime of this magnitude, the writer has reached the conclusion that the defendant is not guilty. However, whether guilty or innocent, under the comprehensive requirements of the common law, which underlie our procedure, substantial evidence should have been adduced to sustain his conviction. That was not done, and so far as concerns this phase of the case it must work a reversal. [State v. Bass, 251 Mo. 107; State v. Francis, 199 Mo. 671; State v. Gordon, 199 Mo. 561; State v. Nesenhener, 164 Mo. 461.]

II. Other features of this proceeding demand more than a passing notice. There was no proof of motive for the commission of the crime. By such proof we mean that which impels the mind to action, culminating in a case of this character, in the commission of the crime. [State v. Webb, 205 S. W. (Mo.) 187.] In ordinary cases where the motive is apparent from the nature of the act, proof of same is not required. [State v. Barrington, 198 Mo. 23; State v. Brown, 181 Mo. 192; State v. Gregory, 178 Mo. 49.] However, in cases as at bar, where the evidence is wholly circumstantial, proof of the presence of motive is of paramount importance. [State v. Concelia, 250 Mo. 411; State v. Hyde, 234 Mo. 200; State v. Gordon, 199 Mo. 561.] There was no sufficient proof of malice. The only effort made to establish this essential was by the proof of threats and an antagonistic attitude of the defendant towards the deceased. We have discussed, in as fair a manner as the nature of the testimony warrants, the evident unreliability of this testimony and that whatever evidentiary force it may have been held to possess, when weighed in the balance of impartial discrimination as against the disinterested testimony of numerous neighbors of the defendant and his wife, it should have been held, as we hold it, to be wanting. Aside from this, the weight of the testimony of the two discredited witnesses was dissipated by the fact that whatever remote threats may have been made by the defendant, there was no evidence of any attempt to consummate them. Besides the amicable relations shown to exist between the defendant and his wife during the days immediately before her death and up to within a few minutes of

that sad event, not only lessens the force of the State's testimony in this regard but cast a shadow upon the credibility of the State's testimony in this matter. [State v. Gordon, 199 Mo. 561.]

Proof of the commission of a homicide and that the defendant on trial for the crime has made previous threats against the deceased is not sufficient to warrant a conviction for murder, unless there is other evidence connecting the defendant with the crime. [State v. Glahn, 97 Mo. 679.]

Nor was there a sufficient proof of the *corpus delicti*. To establish this essential to a conviction both the criminal act and the agency of the defendant in its commission must be shown. There Corpus was ample proof that the death of Mrs. Joy was not due to Delicti. natural causes or to accident, but from a violent assault criminally inflicted. The defendant's agency, however, in its commission was not shown. [State v. Bass, 251 Mo. 1. c. 126; State v. Crabtree, 170 Mo. 1. c. 650; State v. Dickson, 78 Mo. 1. c. 447; Wharton on Homicide (3 Ed.) sec. 587.]

Other than the instruction on murder in the second degree the law as declared by the court was clear, comprehensive and free from error. The instruction on murder in the second degree was not authorized. Where one lies in wait to kill another he is guilty of murder in the first degree. [State v. Payton, 90 Mo. 220.]

This case was continued from time to time for more than a year after the date of the crime. The State has therefore had ample time, if the prosecutor was diligent, as we presume he was, in securing all of the testimony which can possibly be obtained to sustain a conviction. We have shown that it is wholly insufficient. It is useless, therefore, to remand the case, and the reversal must be outright and the defendant discharged. It is so ordered. *Blair, J.*, concurs in a separate opinion; *White, J.*, concurs in the result.

BLAIR, J. (concurring).—I fully concur in the result reached in the opinion of WALKER, P. J., and in all of the opinion, except the following: "Nor was there sufficient proof of the *corpus delicti*. To establish this essential to a conviction both the criminal act and the agency of the defendant in its commission must be shown." Corpus I agree that the criminal agency of the defendant was not Delicti. shown by substantial evidence, and therefore that his conviction cannot be permitted to stand. However, I do not agree that the *corpus delicti* was not sufficiently established. That the dead body was that of Mrs. Joy is not questioned. That she came to her death by the criminal act of some one other than herself is clear beyond the slightest doubt. The establishment of these two facts constitutes full proof of the *corpus delicti*.

From time to time loose expressions have appeared in our decisions to the effect that proof of the *corpus delicti* in homicide cases requires proof that the death of the person alleged to have been killed was caused by the criminal act of the person charged with and on trial for the particular homicide. To such an extent have expressions of this kind appeared in our decisions that 30 Corpus Juris, 285, Section 529 (erroneously, I think) cites the Missouri rule as an exception to the general rule that *corpus delicti* "in criminal homicide involves two elements: (1) The fact of the death; (2) the existence of the criminal agency of another as the cause of death." The text then cites State v. Miller, 204 S. W. 6; State v. Bass, 251 Mo. 107; State v. Shackelford, 148 Mo. 493, and State v. Dickson, 78 Mo. 438, as supporting such supposed exception to the general rule. Other cases not cited by Corpus Juris can be found where the term "*corpus delicti*" has been said to include the criminal agency of the defendant on trial. Corpus Juris calls attention to State v. Henderson, infra, as an exception to the Missouri rule.

The criminal agency of the person on trial for homicide is not a necessary element of the proof of the *corpus delicti* at all. Kelley on Criminal Law and Practice (3 Ed.) page 417, sec. 473, defines it thus: "In criminal homicide, the *corpus delicti* consists of the death of a human being, and criminal agency of another as the means thereof." The same authority at page 233, section 281, says: "In homicide there must be satisfactory proof of the *corpus delicti;* which consists: *first*, of the death of a human being; *secondly*, criminal agency in causing it."

The general rule is that an extrajudicial confession of guilt of homicide will not justify a conviction in the absence of proof of the *corpus delicti.* [Kelley's Criminal Law and Practice, p. 233, sec. 281.] Yet, such extrajudicial confession, without other proof of the criminal agency of the accused, is sufficient to sustain conviction where the death of the person the accused has admitted having killed is otherwise established and it appears that such death was caused by the criminal act of some one. Suppose an example. A is found with a dagger driven into his back between his shoulder blades and it appears that death was the result of such stabbing. The *corpus delicti* is fully shown; that is, death is shown to have occurred and such death was apparently not self-inflicted, nor the result of accident. The agency of B on trial for the homicide is another matter altogether, and must be proven in addition to such proof of the *corpus delicti.* But proof of B's extrajudicial confession of his criminal agency in such death would sufficiently support his conviction.

Inclusion of the criminal agency of the person on trial as an element in the definition of *corpus delicti* has doubtless crept into our decisions in those cases where it happened to be necessary to show

the agency of the accused in order to establish the very fact of death by the criminal agency of some one other than the deceased. For example, A is found dead with a bullet hole in his forehead. There is evidence of powder burns about the fatal wound. A discharged pistol is found near the body. It might be either a case of accident, suicide or homicide. The facts tending to prove that B killed A necessarily have to be shown in order to prove that death was caused by the criminal act of some person other than the deceased. Yet the proof of the criminal agency of B in A's death is not actually any part of the proof of the *corpus delicti,* except that the *corpus delicti* in the particular case cannot be shown save by the same evidence which tends to prove B's criminal agency. The fact that the criminal agency of some one can only be shown under the circumstances of that kind of a case by showing the guilty agency of the person on trial does not change the definition of *corpus delicti,* but doubtless has introduced confusion in defining the term.

In numerous decisions this division and the court en banc have correctly defined *corpus delicti.* For this reason I think Corpus Juris has not correctly stated the Missouri rule. I will refer to three or four cases.

Judge WHITE, when a commissioner of this court, very clearly and correctly defined the term in State v. Schyhart, 199 S. W. 205, l. c. 211, and cited numerous decisions of this court as well as law-writers in support of such definition. The Schyhart case was not a homicide case. However, *corpus delicti* means the same thing, that is the body of the crime, in all criminal prosecutions. (See definition of *corpus delicti* in Webster's New International Dictionary.) Judge WHITE said: "For instance, in a case of homicide the *corpus delicti* consists of two elements: First, that a death has been produced; and second, that the criminal agency of some one was present in its production. The agency of the accused is an element in addition to the *corpus delicti,* which must be proved in order to convict."

In State v. Crabtree, 170 Mo. 642, l. c. 650, GANTT, J., said: "So that while the evidence of the *corpus delicti* was most convincing in this case, in that the dead body was found, and conclusively identified, and the further fact that her death was not the result of accident or suicide, but was caused by external violence by some criminal agent by which her neck was dislocated, still before the conviction of this defendant can stand, his guilty agency in encompassing the death of Alice Stallions must have been established," etc. The Crabtree case is particularly authoritative because it was there held that the evidence was not sufficient to sustain the conviction of Crabtree, that is, not sufficient to establish his guilty agency, although "the evidence of the *corpus delicti* was most convincing."

In State v. Henderson, 186 Mo. 473, l. c. 483, Judge Gantt again said: "The *corpus delicti* in murder consists of two elements, to-wit, the death of the person alleged to have been murdered, and the criminal agency of some one causing said death." In State v. Barrington, 198 Mo. 23, at page 113, Judge Fox, speaking for the court en banc, quoted approvingly from State v. Henderson, supra, the language I have quoted above.

It might be deemed unnecessary again to discuss the meaning of the term "*corpus delicti*" in a case where the members of the court are so thoroughly in accord with the result reached in the main opinion. My only excuse for doing so is the presence in that opinion of the statement that the *corpus delicti* was not proven and the necessity that this court should clearly state its definition of *corpus delicti* in harmony with the great weight of authority in this country. The confusion arising from some of our prior decisions should not longer be allowed to exist. *White, J.,* concurs herein.