THE STATE v. FRANK SMITH, Appellant.—44 S. W. (2d) 45.

Division Two, December 1, 1931.

*Sharp & Baynes* for appellant.

*Stratton Shartel*, Attorney-General, and *Carl J. Otto*, Assistant Attorney-General, for respondent.

COOLEY, C.—In the Circuit Court of New Madrid County the defendant, Frank Smith, was convicted of murder in the first degree for shooting and killing one Lee Haskins. His punishment was fixed by the jury at life imprisonment. He was duly sentenced in accordance with the verdict and he appeals. The serious question presented by the record is whether or not there was sufficient evidence to authorize submission of the case to the jury and to sustain the verdict of guilty.

The evidence on behalf of the State showed in substance the following:

Defendant and Haskins, the deceased, were both negroes living in the city of New Madrid. Haskins was married. Defendant was single and had lodgings in the same quarter of the city in which Haskins resided. Prior to the death of the latter there had been illicit intimacy between the defendant and Haskins' wife and they had, a few days before Haskins' death, planned to run away together to Arkansas. One witness testified to seeing defendant and Mrs. Haskins in bed together two days after Haskins was shot.

The homicide occurred on September 16, 1930, about 7:30 P. M., the time being fixed approximately by witnesses from the fact that they were on their way to a picture show or to church when they heard what was evidently the fatal shot. Haskins appeared to have been in his house when shot and to have been shot through a window. The house fronts west upon an alley eighteen or twenty feet wide, running north and south and regularly used as a thoroughfare by pedestrians. The shot that killed Haskins had evidently been fired through a window on the south side of the house. The sheriff found a small hole through the glass which he called a bullet hole, but said on cross-examination might have been made by a small stone. It was a small hole "straight through" the glass, made from the outside, as shown by particles of glass carried by the missile into the room. "The whole glass was not broken, but it was shattered." A shot could not have been fired from the alley through that window, so whoever fired the shot must have been then on the south side of the house.

The sheriff upon his arrival at Haskins' house, which he thought was thirty minutes or so after the shooting, found deceased outside and near the southwest corner of the house. Haskins was then dead with a bullet wound in his back, the body being still "warm and limber." In the room, the window of which was broken as above mentioned, he found a light burning, a bed and one chair which stood at the foot "near the corner of the bed," with its back toward the window. He found no tracks around the house (whether the ground was wet or dry is not shown) and no blood stains leading from the door to the spot where the body lay. There is no evidence of blood stains having been observed in the house.

On the evening in question Thomas Wade and Fannie Powell, both colored, were overtaken by the defendant "quite a little ways" from Haskins' house and the three walked together a short distance until Wade and Miss Powell "turned off," she to go to church and he to a pool room. While their testimony is not as clear as it might be as to the location with relation to Haskins' house and direction therefrom of this meeting place, we gather from the testimony of these witnesses that the place of meeting was northerly from the house and that defendant was going and continued in the general direction of the Haskins house. Wade said he was going "sort-a" in that direction, "you could go that way," and he also testified that when defendant overtook them he was going south "the same direction we was going." Asked by Wade where he was going defendant said: "Just stomping around."

Soon thereafter defendant was met by three colored people in the alley above referred to, "five or six steps" from Haskins' house. One witness said five or six steps from the house, the other two said "from the corner of the house." Defendant was then going north in the alley. One of these three witnesses, Memphis Wesley, testified that defendant then wore a white shirt, a cap the color of which witness did not notice, and "light looking" trousers. Another, Miss Lowrey, said defendant wore a light shirt and light cap, but she did not notice the color of his trousers. The third, Miss Ross, did not notice how defendant was dressed.

The three witnesses last mentioned were walking fast, fearing they were late for the picture show to which they were bound. When they had thus walked about two blocks from the point where they had met defendant, the time so consumed being estimated at about five minutes, Wesley and Miss Lowrey heard a shot. Miss Ross did not hear it, but heard her companions speak of hearing it. Here also the evidence seems not as clear as it might have been made as to the direction from which the shot sounded, but the effect of the testimony of those witnesses is that the sound came from the direction of Haskins' house.

Another witness, Coot Lee, who lived near Haskins, their houses being separated by "one lot," was at home and heard the shot. He was preparing to go to church and thought the time was about 7:30. It was about the time people were going to church. On hearing the shot he stepped to his door and looked out, but saw no one. About "six or eight" minutes later, as he was starting to church or to a store (he said it both ways) he saw· a man running eastward, not fast, "just·trotting," from the vicinity of Haskins' house. The man was going in the direction of an amusement place called Blue Heaven, which direction was also toward the levee. He passed Blue Heaven. He was not in the street, but was crossing some lots, apparently vacant lots. Defendant lived northwest of Haskins' house. Lee did not recognize the man he saw running, but testified that he was wearing a light cap and a light shirt.

Some forty-five or fifty minutes (estimated) after the shooting the defendant entered a pool room wearing a "light cap and shirt and gray pants." A few minutes later some one came in and reported Haskins' death. Defendant "seemed to be sorry over it." "After a while" he went to Haskins' house, the sheriff being there then, and helped carry the body into the house. That night, how much later is not shown, the sheriff arrested defendant. The sheriff testified that when he arrested defendant the latter "had on a light shirt, light cap, dark vest and I believe his pants was light·"

No witness testified to hearing more than one shot that night. There was but one wound upon deceased. No witness testified to seeing a weapon upon defendant, nor that he had one in his possession. The witnesses who saw and talked with him that evening observed nothing unusual or suspicious in his demeanor.

Another item of evidence must be mentioned. Sam Hurtle testified that on Saturday night preceding Haskins' death, which he said was on Tuesday night, he heard defendant in conversation with one Masterson make a threat against Haskins. The language in which the threat was couched was vulgar and we think it is unnecessary to preserve it in the records of this court. It amounted to a threat against Haskins' life. Masterson, called as a witness by defendant, admitted having had a conversation with defendant at the time and place mentioned by Hurtle, but denied that defendant made the threat or used any such language as Hurtle had testified to. He did not remember what he and defendant had been talking about.

The defendant, testifying in his own behalf, also denied having made the threat or used any language similar to that testified to by Hurtle. He too could not remember what he and Masterson had talked about. Other than his denial of Hurtle's testimony the only testimony given by defendant was this: "Q. Did you shoot into

the house of Lee Haskins? A. No, sir." He offered no further evidence. He requested an instruction in the nature of a demurrer at the close of the evidence directing a verdict of not guilty which the court refused. The point is sufficiently preserved for review.

I. Appellant's insistence that the evidence did not make a submissible case is based upon two contentions: (a) that the evidence was insufficient to prove the cause of deceased's death, and (b) that if that fact was proved there was not sufficient proof to connect the defendant with the offense. Of these in the order named:

(a) There was no evidence as to deceased's physical condition prior to the evening in question or that he suffered from any ailment that might have produced sudden death. There was evidence—the lighted room and the hole through the window, described as a bullet hole—from which it could be inferred that he had been shot through the window while in the house and had been able to make his way outside before falling. A shot had been heard in that vicinity. Some thirty minutes later deceased's body was found just outside the house with one wound upon it, described as a bullet wound, just to the left of the spine and below the shoulder blade, a vital spot if the bullet penetrated to any considerable depth. Death had been recent, the body when found being still warm. Dr. O'Bannon testified that a bullet striking a man at the point described would as a rule prove fatal. On cross-examination he said: "Any way it would range it would be fatal unless an operation was performed immediately." True, he also said in answer to questions on cross-examination that to be fatal the bullet would have to enter the body and that "it would depend on the depth of the wound." There was no evidence that the wound was probed or that the bullet passed *through* the body. But it is common knowledge that a bullet fired from any firearm that shoots bullets would likely penetrate a human body to a considerable depth unless it struck and was stopped by a thick bone, of which in this case there was no evidence. The evidence suggests no other possible cause of Haskins' death. The location of the wound precludes the thought that it was self-inflicted.

In a murder case the fact that the death of the person alleged to have been murdered was caused by the criminal agency of some one, may be proved by circumstantial evidence. [State v. Henderson, 186 Mo. 473, 483, 85 S. W. 576; State v. Barrington, 198 Mo. 23, 113, 95 S. W. 235; State v. Schyhart (Mo. Sup.), 199 S. W. 205, 211; concurring opinion of BLAIR and WHITE, JJ., in State v. Joy, 315 Mo. 7, 19 et seq., 285 S. W. 489, 494, defining *corpus delicti*.] In the case at bar there was sufficient evidence from which the jury could find, as it did, that Haskins' death was caused by the bullet

wound in his back and that such wound was not inflicted by himself. It is not suggested that it could have been inflicted accidentally. This point is ruled against appellant.

(b) A more difficult question is whether or not there was sufficient evidence to sustain a finding that the defendant fired the fatal shot. After careful consideration we are of the opinion that there was sufficient evidence to make a submissible case and to support the verdict. The defendant was shown to have been in immediate proximity to deceased's house just before a shot was heard in that vicinity. There was no evidence that more than one shot was heard so the jury may legitimately have found that the shot so heard was the one which killed Haskins. A few minutes later a man was seen running across lots from the vicinity of the crime. From the description of that man's dress and other testimony as to how defendant was dressed when witnesses met him near Haskins' house just before the shooting and at the pool room shortly thereafter, coupled with the fact that defendant, although he took the witness stand, did not deny being at Haskins' house at the time the State's evidence placed him there or that he was the man who thus ran away after the shooting and the further fact that he gave no account of his whereabouts or movements at that critical time, it is inferable that he was the man who was seen thus furtively departing from the place where the murder had just been committed. During the short interval between the shooting and the time he was seen running away he may have kept himself secreted, waiting to see if the shot had attracted attention and for a favorable time to escape unobserved. It was shown that he had threatened deceased. Motive for the crime, which is of prime importance where, as here, the evidence is wholly circumstantial, may be found in the illicit relations between defendant and deceased's wife and their contemplated elopement, from which it is deducible that defendant wished to get Haskins out of the way in order that he might more easily, perhaps more safely, indulge his covetous desire for Haskins' wife.

In support of his contention that the evidence was insufficient to connect defendant with the offense appellant cites the following: State v. Archer, 6 S. W. (2d) 912; State v. Eklof, 11 S. W. (2d) 1033; State v. Scott, 177 Mo. 665, 76 S. W. 950; State v. Hecke, 294 S. W. 452; State v. Perkins, 18 S. W. (2d) 6; State v. Matticker, 22 S. W. (2d) 647; State v. Hardy, 34 S. W. (2d) 102; State v. Randolph, 34 S. W. (2d) 55; State v. Durbin, 29 S. W. (2d) 80. Those cases were all prosecutions for larceny or for transportation of liquor. We have examined them and find nothing in them that militates against the conclusion we have reached in this case.

State v. Joy, supra, and State v. Bass, 251 Mo. 107, 126, 157 S.

W. 782, are cited in support of the contention that the State failed to prove what caused Haskins' death or that it resulted from the wound shown. Neither case is authority for that contention. In the Joy case the cause of death was clearly shown and that it was due to the criminal agency of some one, but the evidence was held insufficient to show the defendant's connection with the crime. In the Bass case the facts were too dissimilar from those here shown to make it a precedent for this case.

State v. Glahn, 97 Mo. 679, 11 S. W. 260, is cited in support of the contention that "the evidence must be most convincing." That was a murder case in which the evidence was wholly circumstantial. On the whole, we think it no more convincing of the accused's guilt than the evidence in the case at bar, if as much so, but the court held it sufficient and that the judgment should not be reversed for want of evidence to support it. It was reversed and the cause remanded for other reasons. Upon the question of the sufficiency of the evidence the court stated the rule thus:

"The rule even in criminal cases is, that before this court will relieve on the ground that the verdict is not supported by the evidence, there must be either a total failure of evidence, or it must be so weak that the necessary inference is, that the verdict is the result of passion, prejudice or partiality." Citing cases.

That statement of the rule is quoted approvingly in State v. Concelia, 250 Mo. 411, 424, 157 S. W. 778, a murder case in which the evidence was circumstantial and the question of its sufficiency a close one but the conviction was affirmed. A further citation from the Concelia case, same page, seems appropriate:

"From the very nature of things, the quantum of circumstantial evidence which suffices to meet the requirements of the rule that the circumstances proved must be consistent with each other and with the hypothesis that the accused is guilty and so inconsistent with any reasonable hypothesis of innocence as to exclude every rational hypothesis except that of guilt (State v. Morney, 196 Mo. l. c. 49), differs in different cases, so as to preclude the formulation of any fixed, hard-and-fast rule."

In the Concelia case (250 Mo. l. c. 423) the court also refers to "the failure of the accused to account for himself at the time of the crime," as one of the usual indicia of guilt, citing State v. Crabtree, 170 Mo. 642, 656, 71 S. W. 127.

In passing upon the sufficiency of the evidence on appeal, even in criminal cases, "all substantial testimony offered by the State and tending to implicate the accused should be taken as true and every legitimate inference which may reasonably be drawn from such testimony should be indulged. After applying such rule, if there is substantial testimony which tends to support the verdict of guilt

found by the jury, its verdict must be allowed to stand, unless reversible error was committed in the progress of the trial." [State v. Henke, 313 Mo. 615, 627, 285 S. W. 392, citing cases.] We think there was such substantial evidence in this case.

II. Objection was made to this question propounded to Dr. O'Bannon: "Q. Doctor, I will ask you if a bullet struck a man below his shoulder and to the left of the spine, whether in your opinion as a doctor that would be likely to cause death?" 'Objection was made that "it is a hypothetical question, not in the proper form; doesn't touch the facts sought to be proved." The objection was overruled and the witness answered: "As a rule that is a fatal shot."

In his motion for new trial defendant complains of the court's ruling because the question did not embrace all of the facts "on which to base such questions." The objection made at the time that the question was "not in the proper form, doesn't touch the facts sought to be proved," is so vague that it is doubtful whether it can be said to present the reason urged in the motion for new trial or any sufficient reason. If it does suggest that thought defendant did not attempt to point out the omitted facts which should have been included. The question included the essential facts bearing upon the location of the bullet wound which had been shown by the evidence, except that it did not indicate how far below the shoulder and to the left of the spine the bullet struck. However, in answer to a question on cross-examination relative to that subject the witness said, referring to the above quoted question: "From the way I understand the question it was right under the shoulder blade between the shoulder and spine," which is the place where the State's evidence located the bullet wound. As understood and answered by the witness the question embraced the essential facts shown by the evidence. There was no prejudicial error in that ruling.

III. It is urged that the evidence tending to show the illicit intimacy between defendant and Haskins' wife was incompetent and prejudicial and that its admission was reversible error. That evidence was clearly competent as tending to show motive, an important issue in the case, and was properly admitted. [State v. Page, 212 Mo. 224, 236, 110 S. W. 1057; State v. Goddard, 162 Mo. 198, 229, 62 S. W. 697, where intimacy between the defendant and the wife of the deceased, continuing after the homicide, was shown; State v. Everhart (Mo. Sup.), 289 S. W. 604, 608; State v. Henke, supra.]

IV. The assignment in the motion for new trial that the court erred "in admitting incompetent, irrelevant and immaterial evidence

offered by the State over the objection and exception of the defendant at the time and which objection and reasons therefor were stated at the time the objections were made and are now set up here as reasons, being all of the incompetent, irrelevant and immaterial evidence offered by the State over the objection and exception of the defendant at the time," is too general and indefinite to present anything here for review. [State v. Standifer, 316 Mo. 49, 289 S. W. 856; State v. Cox, 22 S. W. (2d) 797.] The same is true of the only complaint of the instructions made in said motion, that: "The court erred in instructions given the jury of its own motion numbered 1, 2, 3, 4, 5 and 6, being all of the instructions given by the court at the instance of the State and of its own motion as not fully declaring the law of this case." [State v. Standifer, supra; State v. Bailey (Mo. Sup.), 8 S. W. (2d) 57; State v. Bowers, 29 S. W. (2d) 58; State v. Gifford (Mo. Sup.), 186 S. W. 1058; State v. Sanders (Mo. Sup.), 4 S. W. (2d) 813; State v. Walker (Mo. Sup.), 14 S. W. (2d) 441.]

The foregoing disposes of all the assignments of error. The information, verdict and judgment are sufficient. The judgment of the circuit court must be and it is affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.