THE STATE v. GARLAND C. LOGES, Appellant.—98 S. W. (2d) 564.

Division Two, November 17, 1936.

*George W. Anson* and *Fred A. Benz* for appellant.

*Roy McKittrick*, Attorney General, and *Wm. W. Barnes*, Assistant Attorney General, for respondent.

COOLEY, C.—Appellant, whom we shall refer to as defendant, was convicted of burglary and larceny, sentenced in accordance with

the verdict of the jury to four years' imprisonment in the penitentiary, two years for each offense, and has appealed. The principal question on this appeal is as to the sufficiency of the evidence to sustain the conviction. The evidence connecting defendant with the crime was circumstantial. The State's evidence tended to show the following:

During the night of September 16, 1935 (Monday night), the granary of H. H. Taylor, a farmer living three miles or so west of Sedalia, in Pettis County, was broken into and some wheat, estimated by Taylor at twenty-five to thirty bushels, worth eighty-five cents a bushel, was stolen therefrom. The burglary and theft were discovered the next day, September 17th. The granary is situated a short distance from a highway on which was Taylor's mail box. George Johnson, who worked for Taylor, went to the mail box on Tuesday, the 17th, as was his custom, to get the mail. He noticed some scattered wheat at the fence between Taylor's premises and the road and from that point fifteen feet or so to some visible automobile tracks in the road. This led to investigation and to discovery of the theft. No scattered wheat was found inside Taylor's inclosure. It was shown, as perhaps accounting for that fact, that Taylor had a large number of hogs in said inclosure.

Upon discovering his loss and on the same day, September 17th, Taylor went to town and reported the burglary and larceny to John C. Whiteman, constable. Defendant, however, had already been "picked up" by police officers of Sedalia and apparently was then in custody. About two o'clock that morning, September 17th, those officers had observed defendant driving through Sedalia. Something, it here matters not what, caused them to stop and question him. He was alone, driving a Model T Ford car, and had in it five sacks of wheat, containing about two bushels each. Some of the sacks had holes in them through which wheat could leak out. To the officers who thus stopped him and later at the police station to which he was taken defendant stated that he and one Jack Williams had stolen the wheat from his, defendant's father and that Williams had gotten more of the wheat than he had. That day seven sacks of wheat, of similar appearance, were found in Williams' garage and were taken possession of by the officers. All twelve sacks,—the five found in defendant's possession and the seven found in Williams' garage,—were impounded in a vault in the sheriff's office and there kept until the trial.

On the morning of the 17th, after defendant had been questioned at the police station, two police officers, Anderson and Glenn, went to the home of defendant's father, W. C. Loges, about three or three and a half miles from the Taylor place, and, with Mr. Loges, examined the latter's wheat bin. They described the appearance of the surface

of the wheat with rat or mice tracks all over it, and both said the wheat in the bin looked as though it had not been disturbed or "any wheat taken out" for some time. Anderson estimated the amount of wheat in Loges' bin at forty or fifty bushels. Both officers testified that Loges did not then claim to have lost any wheat and expressed the belief that he had not. Mr. Loges did not then know that his son had been arrested or claimed to have stolen wheat from him.

On September 18th, Constable Whiteman procured a "sample" of wheat from Taylor's bin, one from one of the sacks in the sheriff's office, and one from W. C. Loges' bin. The quantity of each "sample" thus procured is not shown, but they were put in separate sacks, labeled and preserved until the trial. For convenience and brevity we shall refer to the wheat impounded in the sheriff's office as the stolen wheat. Whiteman immediately or very soon after procuring those samples had them tested. We gather from the record the test made was a weight-test. Two samples, that taken from Taylor's bin and the sample of stolen wheat, tested identically the same, "little over 59 pounds." The sample taken from Loges' bin tested "short 58 pounds." Whiteman said the test made was the "Government United States Standard test." At the trial the State called two witnesses who qualified as experts. Both had had long experience in raising, buying and shipping, testing and grading wheat. Both had had experience in the milling business. One had been engaged in the milling business for fourteen years, during which time he had done the buying and "tested the wheat, graded it according to the kinds, qualities, etc." The other had for years, as he grew up, aided his foster father, who exhibited wheat at fairs, in selecting types of wheat to be exhibited and testing same, and "by association became fairly well acquainted with the different types of wheat,"—this in addition to his subsequent experience in buying and shipping wheat and in the milling business. The wheat samples were shown to those two witnesses at the trial. Both said in substance that the sample taken from Taylor's bin and the sample of the stolen wheat were the same wheat,—identical,—but that the other sample,—the one that had been procured from W. C. Loges' bin,—was a different kind or type of wheat,—one said a different variety, pointing out the difference. He said that wheat grown on different soils might test differently,—we understand he meant as to weight,—and that from examining samples of wheat it would be impossible to tell what kind of ground it was grown on, "but it isn't impossible to tell the different varieties of the wheat."

Defendant testified for himself, denying participation in or knowledge of the burglary and larceny charged and claiming, as he had told the officers when arrested, that he and Williams had stolen

twelve sacks of wheat from his father that night, he keeping five and Williams seven. He gave a circumstantial account of how and where they had loaded the wheat into their cars. At and about that place some scattered wheat was found by officers and others, upon examination some three days after defendant's arrest. Defendant testified that he had, some weeks prior to the occasion in question, stolen about twelve bushels of wheat from his father's granary. W. C. Loges testified that on September 18th he "measured up" his wheat and found it short about thirty-six bushels,—approximately the total amount defendant testified to having stolen from him on the two occasions. There were other circumstances testified to on behalf of defendant, tending to corroborate his story, but since they only presented questions for the jury, if the State made a submissible case, they need not be detailed.

 Defendant contends that the identification of the wheat found in his possession as Taylor's wheat was insufficient to authorize a finding of that fact,—essential in this case to make a submissible case. The question is perhaps close but after careful consideration we are of the opinion that the evidence on behalf of the State was sufficient to take that question, and therefore the case, to the jury. The fact of the burglary and larceny was clearly shown. If the evidence justified a finding that the wheat found in defendant's possession was part of the wheat stolen from Taylor the State made a submissible case. In the recent case of State v. Moore, 339 Mo. 52, 95 S. W. (2d) 1167, in which the defendant was charged with burglary and larceny, the stolen property was shelled corn. We there held, on the question of identification of the corn found in the defendant's possession as corn stolen from the prosecuting witness, Johnson, that the best that could be said of the State's evidence was that it showed that the alleged stolen corn "resembled" the corn in Johnson's crib and could and might have been his. We held that insufficient. In the instant case we have evidence showing more than mere resemblance, even strong resemblance.

The evidence in this case justified a finding that the wheat found in defendant's possession came either from Taylor's granary or from that of W. C. Loges. The jury could hardly have found otherwise, except by indulging in speculation, unwarranted by the evidence. Samples of wheat from both places, together with a sample of the alleged stolen wheat, were carefully tested and compared. Not only did the samples of wheat taken from Taylor's bin and the alleged stolen wheat test the same and differ from the test of the wheat taken from Loges' bin, but the expert testimony, the weight and value of which was for the jury, was to the effect that said samples taken from Taylor's bin and from the alleged stolen wheat were the "same wheat,"—identical,—and of a different type or variety from that

taken from Loges' bin. Also, there was some evidence tending to show that, when examined immediately after defendant's arrest, the wheat in Loges' bin showed indications of not having been recently disturbed.

In connection with this question of identification, appellant advances the further argument that the State's evidence fails to show whether the sample of what we have denominated stolen wheat was taken from one of the five sacks found in defendant's car or one of the seven taken from Williams' garage. The evidence does fail so to show. When the sample was procured by Whiteman the twelve sacks were all impounded in the sheriff's office. They appear to have been similar in appearance and Whiteman did not know whether he procured his sample from one of said five or one of said seven. But defendant told the officers when he was arrested and later testified that he and Williams stole twelve sacks of wheat, of which he kept five and Williams seven. Five were taken from him and seven from Williams' garage. They were similar in size and appearance. Defendant himself, at the trial, could not tell whether a sack of wheat brought into the courtroom was one of the five he had kept or one of the seven he said Williams had kept. From these and other circumstances shown we think the finding was amply warranted that all of said twelve sacks of wheat were stolen at the same time and from the same place. Indeed, it appears that defendant presented his case and made his defense on the theory that all of said twelve sacks of wheat were stolen by him and Williams at the same time and from the same place, but that they were stolen from his father and not from Taylor. Both sides appear to have contested the case below on that theory.

It is familiar law that the jury may believe part of a witness's testimony and refuse to credit other portions thereof. The jury may have believed, from defendant's testimony and from other facts and circumstances shown, that he stole the wheat, and may have believed his statement that Williams was his accomplice, but may have disbelieved his claim that the wheat was stolen from his father. If, as the jury may well have found, the twelve sacks of wheat were stolen at the same time and from the same place, it matters not from which of the twelve sacks the sample of stolen wheat was taken. All, as the evidence indicates, would be of the same kind and variety,—the "same wheat," and all were parts of the stolen wheat.

Proof of the identity of property such as that here in question, —wheat or other grain,—is necessarily somewhat difficult. We recognize that the difficulty of proving a fact does not dispense with the necessity of proving it if it be a fact essential to the making of a case. But such fact, like others, may be proved by circumstantial evidence. Likewise we are not unmindful of the rule that, broadly and general-

ly stated, where the evidence is wholly circumstantial, the circumstances shown must be consistent with each other and tend to prove guilt and must be inconsistent with the hypothesis of the defendant's innocence. The rule has been often stated and elaborated in our decisions and is familiar to bench and bar. We merely refer to it here, without attempting a formal or complete statement thereof.

The question of submissibility necessarily depends upon the facts and circumstances of the particular case. We have concluded in the instant case that there was sufficient evidence to make it a question for the jury whether or not the wheat found in defendant's possession immediately after the burglary and larceny was part of the wheat stolen, and sufficient evidence to take the case to the jury.

 Defendant asserts that the court erred in refusing his instruction in the nature of a demurrer to the evidence requested at the close of the State's evidence (there was no demurrer offered at the close of all the evidence) for a further reason, viz., he argues that the evidence conclusively shows that the burglary and accompanying larceny, if any, were committed prior to the night of September 16th, and that under all the evidence defendant could not be found to have committed it,—at least the burglary,—unless it was done on the night of the 16th. This contention also, to some extent, enters into defendant's criticism of the instructions, which required the jury to find that the offense was committed on the 16th. The argument is based upon certain testimony of Taylor, given on cross-examination, and assumes that said testimony was all of Taylor's testimony on that point and was conclusive on the State,—an erroneous assumption. For an understanding of this contention it will be necessary to state somewhat more fully the testimony on this point.

On direct examination Taylor testified in substance that his granary door was closed and fastened as usual on the evening of September 16th; that the "next day,"—the 17th,—after his employee, Johnson, discovered the scattered wheat in the road, as we have above stated, he investigated and found that the granary had been broken into and some wheat stolen. His direct examination indicates that he discovered the burglary and larceny by investigation made pursuant to the discovery by his employee, Johnson, of the scattered wheat in the road. On cross-examination, which was somewhat lengthy, he said at one time that he discovered at "probably about nine o'clock" on the morning of the *16th*, that the granary had been broken into and that some wheat had been stolen. But he further testified positively that on the same day on which he discovered that his granary had been broken into and his wheat stolen he went to town and reported to Constable Whiteman; that on the 16th, if that was Monday (as it was), he was at home all day and did not go to town. Whiteman's testimony was positive and clear that Taylor reported to him

on Tuesday, the 17th. Johnson's testimony was equally positive and clear that he discovered the scattered wheat in the road on the 17th and that, pursuant thereto, investigation was made and the fact discovered that the granary had been broken into and some wheat stolen the preceding night. Johnson's testimony also was to the effect that the granary door was closed and fastened as usual on the evening of the 16th. From the evidence as a whole it is clear,—at least the jury may well have found,—that Taylor was confused when, on cross-examination, he said he discovered on the 16th that his granary had been broken into and his wheat stolen. His testimony, as a whole, shows that he made that discovery on the 17th, especially when considered with the testimony of Johnson and Whiteman. This contention must be ruled against appellant.

■ In the motion for new trial and in appellant's brief it is charged as error that the information as originally filed and to which defendant pleaded not guilty charged the commission of the offense to have been *on* September 16th, and that at some time thereafter it was, without leave of court, amended by interlineation to charge said commission to have been "on or about" the 16th. There is nothing in the record showing or tending to show that any change or amendment of the information as originally filed was ever made. It is too well settled to require citation of authorities that allegations of that kind in a motion for new trial or in a brief do not prove themselves.

■ Appellant makes the novel contention that Instruction No. 6 was erroneous because "by statement and implication" it prohibited the jury from directing that both terms of imprisonment assessed should run concurrently if the jury found the defendant guilty of both burglary and larceny as charged. By Instruction No. 5 the court defined and submitted the offense of burglary. By Instruction No. 6 it defined and submitted larceny committed in connection with the burglary, if the jury should find that defendant committed the burglary, and directed the jury that if they found both they should assess the punishment for the larceny at imprisonment in the penitentiary for "a further term,"—i. e., in addition to the punishment assessed for the burglary,—of not less than two nor more than five years. The punishment thus directed to be assessed is in accordance with the provisions of the statute, Section 4056, Revised Statutes 1929 (Mo. Stat. Ann., p. 2854), and the instruction was correct in so directing. The jury assessed the minimum statutory penalty for each offense. It was not for the jury to say, when finding defendant guilty of both offenses, that the penalties assessed for each, or sentences to be pronounced by the court, should run concurrently. The statute fixes the minimum limits of the punishment the jury may assess.

 Instruction No. 7 is criticized. That instruction submitted petit larceny in case the jury should not find defendant guilty of burglary. We think the instruction correct but since the jury found defendant guilty of burglary and of larceny committed in connection therewith said Instruction No. 7 need not be further considered.

 Appellant complains of the refusal of his requested Instruction E, reading as follows:

"The court instructs the jury, that the declarations of an individual, made at the moment, or immediately thereafter the occurrence of a particular act, when the circumstances are such that we may assume that his mind is controlled by the event, because such statements are supposed to be expressions involuntarily forced out of him by the particular event, and thus have an element of truthfulness they might not otherwise have. This doctrine applies only to statements made at the time when it was forced out as the utterance of a truth, forced out against his will or without his will, and at a period of time so closely connected with the transaction that there has been no opportunity for subsequent reflection or determination as to what it might or might not be wise for him to say."

While not specifically mentioning the defendant it is plain the instruction was designed to apply to his statements made to the officers when he was arrested. It evidently proceeds upon the theory that such statements were part of the *res gestae*, as shown by the motion for new trial. That they were not part of the *res gestae* is too plain to require discussion. Moreover the instruction is argumentative and, if given, would have amounted to a comment on the defendant's testimony. It was properly refused.

There are some other assignments of error which we find without merit and deem it unnecessary to discuss. Defendant appears to have had a fair trial and we think the verdict is supported by substantial evidence. We find no reversible error in the record. The judgment is affirmed. *Westhues* and *Bohling*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.